**PENNSYLVANIA BOARD OF PROBATION AND PAROLE, Petitioner,**

v.

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 4, 2012.

Decided Feb. 22, 2013.

Ordered Published May 14, 2013.

John C. Manning, Assistant Counsel, Harrisburg, for petitioner.

Ryan A. Hancock, Assistant Chief Counsel, Philadelphia, for respondent.

BEFORE: LEAVITT, Judge, BROBSON, Judge and McCULLOUGH, Judge.

OPINION BY Judge McCULLOUGH.

The Pennsylvania Board of Probation and Parole (Board) petitions for review of the September 27, 2011 interlocutory order of the Pennsylvania Human Relations Commission (PHRC) denying the Board's motion to dismiss the discrimination complaint filed against it by Rhonda Manson. The Pennsylvania Civil Service Commission (CSC), acting as *amicus curiae*, has filed a brief in support of the PHRC's position.

By letter dated January 7, 2009, the Board notified Manson that she was being terminated from her position as Parole Agent 2 due to her violation of the Board's

Code of Conduct and violations of the Board's Operations and Procedures Manual. The Board's decision was based on its determination that Manson maintained a private relationship with an individual under the Board's supervision; stored her Board-issued firearm in her home in a manner that made it accessible to others; and failed to carry her Board-issued firearm and safety equipment at times required by Board policy. (CSC Findings of Fact, Nos. 1–2.)

On January 16, 2009, Manson filed a complaint with the PHRC alleging that the Board discriminated against her based on sex when it terminated her employment. (Reproduced Record (R.R.) at 1–3.) Shortly thereafter, Manson filed an appeal of her discharge with the CSC, which held a hearing on March 27, 2009, pursuant to sections 951(a) and (b) of the Civil Service Act (CSA).[1] (R.R. at 11.) Two issues were before the CSC: 1) whether the Board established just cause for Manson's termination; and 2) whether Manson's removal from her regular status position was the result of sex discrimination.

The CSC's relevant findings may be summarized as follows. Manson was employed by the Board as a Parole Agent 2 for approximately five years. (CSC Finding of Fact No. 4.) The Board's Code of Conduct prohibits employees from fraternizing with individuals under the Board's supervision. (CSC Finding of Fact No. 5.) According to Board procedures, employees must carry Board-issued oleoresin capsicum spray (OC Spray) and/or an expandable baton when carrying their firearm or participating in a planned arrest, search,

**1.** Act of August 5, 1941, P.L. 752, *as amended,* added by the Act of August 27, 1963, P.L. 1257, 71 P.S. §§ 741.951(a) and (b). The date of Manson's appeal to the CSC is not evident from the record. However, sections 951(a) and (b) of the CSA provide that an

appeal may be filed within twenty days of notice of an adverse employment action or within twenty days of an alleged violation of section 905.1 of the CSA, added by the Act of August 27, 1963, P.L. 1257, 71 P.S. § 741.905a, which prohibits discrimination.

or prisoner transport. (CSC Findings of Fact Nos. 10–11.) Board procedure also requires employees, when at home and off duty, to store their weapons in their residence in a safe location, with the pistol lock in place and ammunition stored separately, and to ensure that weapons stored in the home are not accessible to others. (CSC Finding of Fact No. 9.)

On August 14, 2008, Manson completed a "Loss of or Damage to Commonwealth Property or Equipment" form in which she indicated that her firearm was missing. (CSC Finding of Fact No. 14.) Manson also reported the firearm as stolen to the police. (CSC Finding of Fact No. 15.) In response, the Board placed Manson on desk duty and requested that the Board's Office of Professional Responsibility (OPR) launch an investigation into the missing firearm. (CSC Finding of Fact No. 16.) Frank Margerum, a special investigator with OPR, conducted the investigation. (CSC Finding of Fact No. 17.)

Margerum conducted three separate interviews with Manson. During the first interview, Manson told Margerum that she believed her friend Robert Thompson, previously a parolee who was subsequently incarcerated, had taken her firearm. (CSC Finding of Fact No. 20.) She did not indicate whether she knew Thompson was previously on parole or was currently incarcerated. (CSC Finding of Fact No. 34.) Manson also stated that she never carried any of her safety equipment. (CSC Finding of Fact No. 21.) In addition, Manson told Margerum that she stored her Board-issued firearm in several different locations. Initially, she stored the firearm in her son's bedroom and then relocated it to her bedroom on the floor in the corner under a blanket. (CSC Finding of Fact No. 22.) She also stated that the firearm's holster and two of the three magazines for the firearm were missing. (CSC Finding of Fact No. 23.) During the second interview, Manson told Margerum that the key to the firearm's lock also was missing. (CSC Findings of Fact Nos. 28–29.) Margerum interviewed Thompson, who was incarcerated at SCI–Rockview and previously had been on parole. Thompson stated that he had a personal relationship with Manson and had frequent access to her home. (CSC Finding of Fact No. 31.) Subsequently, during Margerum's third interview with Manson, she stated that Thompson had last been in her home at the end of August 2008 and she believed he was responsible for the missing firearm. (CSC Finding of Fact No. 33.) On December 5, 2008, the Board conducted a fact-finding to determine two issues: 1) whether the Board demonstrated "just cause" for Manson's removal; and 2) whether Manson's removal resulted from sex discrimination. (R.R. at 21.) Afterwards, Brenda Estep, the Board's Director of Human Resources, approved Manson's removal. (CSC Findings of Fact Nos. 35–36.)

In addition to the above facts, the CSC found that on July 31, 2006, the Board issued a one-day suspension without pay to a male Parole Agent 2 for failing to properly secure his Board-issued firearm at his residence, and that, on November 16, 2007, the Board issued a three-day suspension to him for failing to carry two loaded magazines on his person while carrying his firearm.[2] (CSC Findings of Fact Nos. 37–38.)

---

2. In support of her claim of sex discrimination, Manson, who proceeded before the CSC *pro se,* presented two documents she subpoenaed from the Board, Exhibits 4 and 5, which officially record the reasons for the discipline imposed upon the male Parole Agent 2. The CSC admitted these documents over the Board's hearsay objection. Although Manson did not raise this issue, the CSC noted that these documents were business records of the

In its decision, the CSC reviewed the evidence, including the testimony of Manson, Thompson, Margerum, Estep, and two other witnesses, and noted both parties' burdens of proof. The CSC concluded that the Board failed to establish that Manson was aware that Thompson was on parole when he was a guest in her home, and, therefore, she was not properly charged with violating the Board's Code of Conduct. (R.R. at 41–42.) However, the CSC found that the Board provided sufficient evidence to prove the remaining charges, specifically noting Manson's admissions that she rarely carried her firearm and safety equipment when she was on duty and that she stored her firearm in a particularly dangerous manner. (R.R. at 43–44.) The CSC ultimately concluded that Manson's violations of the Board's procedures constituted good cause for discipline. More specifically, the CSC determined that although the Board failed to present evidence establishing just cause for Manson's termination, it presented sufficient evidence to establish good cause for Manson's suspension. (R.R. at 46.)

The CSC further concluded that Manson failed to present evidence establishing discrimination violative of section 905.1 of the CSA. (R.R. at 44.) The CSC determined that Manson and the male Parole Agent 2 were not similarly situated because the male agent's infractions did not involve the loss of his firearm. (*Id.*) The CSC also noted that the disparity in the discipline imposed between the two agents was easily justified by the difference in the magnitude of their respective charges. (R.R. at 44.)

Accordingly, by decision and order dated September 15, 2009, the CSC invoked its authority to modify the disciplinary action imposed by the Board to a thirty-day suspension without back pay or benefits. The Board appealed the CSC's modification to this Court, which affirmed the CSC's modification and decision to set aside Manson's removal.[3] *Pennsylvania Board of Probation and Parole v. State Civil Service Commission (Manson)*, 4 A.3d 1106 (Pa. Cmwlth.2010).

On February 5, 2009, while the CSC's decision was pending, the PHRC served a copy of Manson's discrimination complaint and related documents on the Board. The Board submitted an answer to the complaint on or about March 11, 2009.[4] In February 2010, the PHRC alerted Manson that it had been one year since the filing of her complaint and that she now had the right to bring an action in the appropriate court.[5] Meanwhile, the PHRC continued its investigation of Manson's complaint.

---

Board and therefore did not constitute inadmissible hearsay. (R.R. at 44 n.5.)

3. In doing so, we took note of the CSC's conclusion that Manson failed to present evidence establishing her claim of sex discrimination. *Pennsylvania Board of Probation and Parole v. State Civil Service Commission (Manson)*, 4 A.3d 1106, 1112 n. 9 (Pa.Cmwlth. 2010). We further noted that Manson complained of that ruling in her *pro se* brief to this Court, but we did not consider her objections because she did not file a proper cross-appeal from the CSC's decision. *Id.*

4. Pennsylvania Human Relations Act ("PHRA"), Act of October 27, 1955, P.L. 744,

as amended, 43 P.S. §§ 951–963. Section 9 of the PHRA, 43 P.S. § 959, sets forth the procedures governing claims filed with the PHRC.

5. Section 12(c)(1) of the PHRA states as follows:

In cases involving a claim of discrimination, if a complainant invokes the procedures set forth in this act, that individual's right of action in the courts of the Commonwealth shall not be foreclosed. If within one (1) year after the filing of a complaint with the Commission, the Commission dismisses the complaint or has not entered into a conciliation agreement to

On April 8, 2011, the PHRC issued a Finding of Probable Cause against the Board. The PHRC found that similarly situated male parole agents "were given more favorable treatment because they were not terminated despite multiple similar infractions." (PHRC Finding of Fact No. 29.) Specifically, the PHRC cited violations of the Board's Code of Conduct and violations of the Board's Operations and Procedures Manual by five males in the position of Parole Agent 2 and the corresponding disciplinary actions taken against them by Human Resources Director Estep. (PHRC Findings of Fact Nos. 30–51.) In addition, the PHRC issued a statement of "Terms of Adjustment" which, among other things, directed the Board to pay Manson back wages, restore her seniority, pension and other benefits, and reimburse her for various expenses resulting from the Board's discriminatory practices. (R.R. at 55.)

On April 13, 2011, the Board received the PHRC's Finding of Probable Cause. The PHRC also notified the Board that the PHRC had a statutory duty to endeavor to eliminate the unlawful practice complained of, by conference, persuasion or conciliation.[6] On August 30, 2011, the Board filed a motion to dismiss Manson's discrimination complaint, asserting that the CSC had already determined that Manson's discharge was not the result of sex discrimination and, therefore, the PHRC was collaterally estopped from relitigating that issue. PHRC staff counsel filed a reply.[7]

On September 27, 2011, a PHRC motions commissioner issued an interlocutory order denying the Board's motion to dismiss. The commissioner rejected the Board's arguments, explaining that the public policies of the CSC and the PHRC are substantially dissimilar and that the PHRC has exclusive jurisdiction over the question of whether Manson's termination was the result of sex discrimination. The order expressly stated that it was entered pursuant to section 12 of the PHRA and relevant judicial determinations related to the non-adjudicative nature of determinations made by the PHRC during the exercise of its investigative jurisdiction.[8] The order concluded with a statement that investigative determinations do not adjudicate the rights of the parties, and, therefore, "this Interlocutory Order is non-adjudicative in nature." (R.R. at 61.)

On October 26, 2011, the Board filed an application to amend the PHRC's interloc-

---

which the claimant is a party, the Commission must so notify the complainant. On receipt of such a notice the complainant shall be able to bring an action in the courts of common pleas of the Commonwealth based on the right to freedom from discrimination granted by this act.
43 P.S. § 962(c)(1).

6. Section 9(c) of the PHRA states that "[i]f it shall be determined after such investigation that probable cause exists for crediting the allegations of the complaint, the Commission shall immediately endeavor to eliminate the unlawful discriminatory practice complained of by conference, conciliation and persuasion." 43 P.S. § 959(c).

7. 16 Pa.Code § 42.34(c) provides that PHRC staff counsel shall reply to motions that seek to limit the PHRC's ability to proceed with a complaint.

8. *Baker v. Pennsylvania Human Relations Commission*, 507 Pa. 325, 332, 489 A.2d 1354, 1357–58 (1985) (holding that a PHRC order finding that a complaint lacked probable cause was not an adjudication under 2 Pa.C.S. § 101 and thus not appealable under 2 Pa.C.S. § 702); *Graves v. Pennsylvania Human Relations Commission*, 160 Pa.Cmwlth. 65, 634 A.2d 701, 703 (1993)(holding that the Commonwealth Court lacked jurisdiction to review the PHRC's dismissal of an untimely complaint because the dismissal was not a final appealable order).

utory order pursuant to Pa.R.A.P. 1311(b), pertaining to petitions for permission to appeal interlocutory orders. By order dated December 8, 2011, in response to a praecipe filed by the Board, a PHRC motions examiner deemed the Board's order denied. On December 23, 2011, the Board filed a petition for review with this Court seeking review of the PHRC's interlocutory order.[9] We granted the Board's petition for review to consider the following issue:

> Whether the [PHRC] is collaterally estopped from investigating a claim of improper discrimination based on sex when the [CSC] previously concluded that [Manson] had failed to present evidence establishing such discrimination and [Manson] did not appeal the [CSC's] adjudication which suspended her for thirty days?

*Pa. Bd. of Probation and Parole v. Pa. Human Relations Comm'n*, 66 A.3d 390, 2013 WL 2015982 (Pa.Cmwlth.2012).[10]

■ The doctrine of collateral estoppel is based on the policy that a losing litigant does not deserve a rematch after fairly suffering a loss in adversarial proceedings on an issue identical in substance to the one he subsequently seeks to raise. *Plaxton v. Lycoming County Zoning Hearing Board*, 986 A.2d 199, 208 (Pa. Cmwlth.2009). Generally, collateral estoppel forecloses re-litigation of issues of fact or law in subsequent actions where the following criteria are met: (1) the issue in the prior adjudication was identical to the

one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in a prior action; and (5) the determination in the prior proceeding was essential to the judgment. *Callaghan v. Workers' Compensation Appeal Board (City of Philadelphia)*, 750 A.2d 408, 412 (Pa.Cmwlth. 2000). Application of collateral estoppel in a particular case is a question of law over which our review is plenary. *Cohen v. Workers' Compensation Appeal Board (City of Philadelphia)*, 589 Pa. 498, 504, 909 A.2d 1261, 1265 (2006).

■ In the present case, the Board argues that the CSC's finding that Manson's removal was not a result of sex discrimination collaterally estopped the PHRC from investigating and subsequently adjudicating Manson's claim of sex discrimination against the Board under the PHRA. In response, the PHRC asserts that the Board cannot establish two of the necessary elements of collateral estoppel. Specifically, the PHRC argues that the legal issues in each proceeding were distinct, not identical. The PHRC also asserts that Manson did not have a full and fair opportunity to litigate her claim of sex discrimination before the CSC. Having considered these arguments, we conclude that our decisions in *Irizarry v. Office of General Counsel*, 934 A.2d 143 (Pa.Cmwlth.2007),

---

9. Our scope of review is limited to determining whether the PHRC violated constitutional rights, made findings of fact which are not supported by substantial evidence, or committed an error of law. *United Brotherhood of Carpenters and Joiners of America, Local 261 v. Pennsylvania Human Relations Commission*, 693 A.2d 1379, 1382 n. 5 (Pa.Cmwlth. 1997).

10. We recognize that the Board is appealing from an interlocutory order. However, where an administrative agency refuses to amend its order and a petition for review is filed under Chapter 15, if the petition for review is subsequently granted, the effect is the same as if a petition for permission to appeal has been filed and granted. Pa.R.A.P. 1311.

and *Department of Corrections v. Workers' Compensation Appeal Board (Wagner-Stover )*, 6 A.3d 603 (Pa.Cmwlth.2010), are controlling and that collateral estoppel applies.

This Court has previously applied collateral estoppel to the findings of one state administrative proceeding to a subsequent, different one. In *Irizarry*, our Court held that collateral estoppel did apply and that the findings of an arbitrator in an employee's grievance proceeding had a preclusive effect in subsequent proceedings before the Office of General Counsel. In *Irizarry*, an employee (Employee) was discharged from the Department of Licensing (Department) for issuing a duplicate commercial driver's license to an applicant who was not the individual pictured on the original license. Prior to her discharge, Employee filed a lawsuit against the Department alleging sexual harassment, a hostile work environment and retaliation. Sometime after her discharge, Employee submitted a grievance asserting that the Department did not have just cause to terminate her employment.

Subsequently, the holder of the original license filed a civil suit against Employee. Employee requested that the Office of the Attorney General (AG) represent her, but the AG denied her request on the grounds that her willful misconduct in issuing the license rendered her outside the scope of her employment.

Thereafter, an arbitrator conducted a hearing on Employee's grievance. The arbitrator upheld the Department's discharge of Employee and concluded that she seriously violated prescribed policies and procedures. Months later, the AG entered into an agreement with Employee to settle her lawsuit against the Department. The agreement provided that the Department would pay Employee $60,000 in exchange for Employee's release of all claims against the Department arising out the termination of her employment.

Subsequently, the civil suit instituted against Employee was dismissed and Employee submitted an application for attorney's fees and costs to the AG. The AG forwarded the application to the Office of General Counsel. The Department argued that the arbitration and settlement agreement barred Employee's claim and as a result the General Counsel was foreclosed from holding a hearing on the application. The General Counsel denied Employee's application without a hearing and held that Employee's dismissal for misconduct and the arbitrator's award upholding her dismissal justified the denial of her application for attorney's fees.

On appeal to this Court, Employee argued that collateral estoppel did not foreclose the General Counsel from holding a hearing on the merits of her application because the issues raised in the arbitration hearing were not identical to the issues raised before the General Counsel and because she was denied a full and fair opportunity to litigate the issues on the merits in the first proceeding. Rejecting Employee's argument, we explained that, "[i]f the parties to an action have had an opportunity to appear and be heard in a prior proceeding involving the same subject matter, all issues of fact, which were actually adjudicated in the former action and essential to the judgment therein are concluded as between the parties even though the causes of action in the two proceedings are not identical." *Irizarry* at 151.

We concluded in *Irizarry* that the identity of issues element of collateral estoppel was satisfied even though the two proceedings concerned two separate legal issues. Because the "material facts necessary to the disposition of both actions were identical," we concluded that the contested issues were identical, regardless of the legal

principles involved. We also determined that Employee had a full and fair opportunity to litigate the issue of her alleged misconduct in the arbitration proceeding because she testified on her own behalf and did not deny the conduct that resulted in her discharge. Concluding that the elements of collateral estoppel were satisfied, we affirmed the General Counsel's denial of a hearing.

More recently, in *Wagner–Stover*, this Court held that a prior adjudication by the Department of Corrections (Department) that the claimant was fully recovered from work-related post-traumatic stress disorder collaterally estopped a WCJ from revisiting that issue. In *Wagner–Stover*, the claimant was employed by the Department as a canteen manager at a prison commissary. After a riot occurred at the facility, the claimant suffered a psychiatric injury, and the Department provided her with total disability benefits under the Workers' Compensation Act[11] and full salary benefits under former Act 632.[12] After the claimant continually declined various job offers from the Department, the Department held an administrative proceeding to terminate the claimant's Act 632 benefits. Relying on the testimony of expert witnesses, a hearing examiner determined that the claimant was no longer suffering from a work-related disorder but was fully recovered and capable of returning to a position offered to her by the Department. The Secretary of Corrections adopted the hearing examiner's opinion and terminated the claimant's Act 632 benefits.

In a subsequent proceeding to terminate the claimant's workers' compensation benefits, the Department argued that the prior Act 632 adjudication collaterally es-topped the claimant from arguing that she was not fully recovered. The workers' compensation judge rejected the Department's argument and denied its termination petition. The Workers' Compensation Appeal Board affirmed.

In *Wagner–Stover,* we first considered whether the issues addressed in the Act 632 proceeding were identical to those in the workers' compensation proceeding. We observed that in Act 632 termination proceedings, the employer must prove that the claimant's injury no longer prevents him from returning to work. Similarly, in order to terminate workers' compensation benefits, an employer must prove that the claimant's disability has finally ceased. Noting that the Department's proof of full recovery satisfies the employer's burden under both statutes, we concluded that the dispositive factual question, the claimant's full recovery, was identical in each proceeding. In reaching this conclusion, we relied on the words of our Supreme Court in *Rue v. K–Mart Corp.,* 552 Pa. 13, 19, 713 A.2d 82, 85 (1998), "[a] fact is a fact regardless of public policy." *Wagner–Stover,* 6 A.3d at 612–13.

We next addressed whether the claimant had a full opportunity to litigate the issue of her recovery in the Act 632 proceeding. Following the two-fold inquiry established in *Cohen v. Workers' Compensation Appeal Board (City of Philadelphia),* 589 Pa. 498, 909 A.2d 1261 (2006), we considered whether the amount at risk financially and the type of procedural rules governing each proceeding are similar. We noted that Act 632 is more generous because it provides full salary, whereas workers' compensation disability benefits are limited to two-thirds of a claimant's weekly

---

**11.** Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708.

**12.** Act of December 8, 1959, P.L. 1718, No. 632, *as amended,* formerly 61 P.S. §§ 951–952. In 2009, when its terms were codified into 61 Pa.C.S. § 1101, Act 632 was repealed.

wage [13] and that under both statutes benefits can potentially last for a lifetime. We determined that the amounts in controversy provided by both acts were comparable, noting that both provided "potentially lifetime compensation for lost wages caused by a work injury." *Wagner–Stover*, 6 A.3d at 613.

Next, we compared the proceedings provided by the two statutes. We noted that workers' compensation proceedings are governed by special rules adopted by the Department of Labor and Industry, whereas Act 632 proceedings are governed by the General Rules of Administrative Practice and Procedure (General Rules), 1 Pa.Code §§ 31.1–35.251.[14] We concluded that, although the proceedings were governed by different rules, both involved comparable procedures that were sufficiently formal to allow each litigant to develop a complete record on a disputed fact. Having determined that the amount

in controversy and the applicable procedures in each agency's proceeding were similar, we concluded that the full and fair opportunity to litigate prong of collateral estoppel was satisfied. Accordingly, we held that the finding of the claimant's full recovery by the Secretary of Corrections is a finding of fact made after a full and fair hearing and is entitled to be given preclusive effect in the workers' compensation proceeding.

In this case, the Board correctly describes the dispositive issue as whether the Board's decision to terminate Manson was based on sex discrimination. The PHRC disputes that description and contends that the issue before the CSC was whether Manson was terminated because of a non-merit factor. However, the CSA, like the PHRA, provides that an employee may not be terminated as a result of discrimination.[15] Thus, non-merit factors include employment decisions based on discrimina-

---

13. By way of illustration, a claimant earning a pre-injury weekly wage of $600 would receive $31,200 annually in Act 632 benefits and $20,800 in annual workers' compensation benefits. Thus, the parties arguably had more at stake financially in the prior proceeding.

14. The General Rules govern all practice and procedure in Commonwealth agencies except where an agency has "promulgated inconsistent regulations on the same subject." 1 Pa. Code § 31.1(c). The Department of Labor and Industry has opted out of the General Rules for purposes of workers' compensation litigation. *See* Section 131.4 of the Special Rules of Administrative Practice and Procedure Before Workers' Compensation Judges, which states, "General Rules of Administrative Practice and Procedure are not applicable to activities of and proceedings before [workers' compensation] judges." 34 Pa.Code § 131.4.

15. Section 905.1 of the CSA provides:

No officer or employee of the Commonwealth shall discriminate against any person in recruitment, examination, appoint-

ment, training, promotion, retention or any other personnel action with respect to the classified service because of political or religious opinions or affiliations because of labor union affiliations or because of race, national origin or other non-merit factors.

71 P.S. § 741.905a.

Similarly, section 5(a) of the PHRA provides:

It shall be an unlawful discriminatory practice ... (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract ...

43 P.S. § 955(a).

tion. The factual issue decided by the CSC, whether Manson's termination by the Board was based on sex discrimination, is identical to the issue raised before the PHRC. Relying on our Supreme Court's observation in *Rue* that "[a] fact is a fact," we conclude that the first prong of collateral estoppel, identity of issue, is satisfied in this matter. *Rue,* 552 Pa. at 19, 713 A.2d at 85.

We also find that the second and third prongs of collateral estoppel, i.e., a final judgment on the merits and the presence of the same party (or one in privity with the same party) are readily satisfied in this instance. There is no dispute that the CSC's unappealed decision after a full evidentiary hearing was a final judgment on the merits and clearly Manson has been a party to both the CSC and PHRC proceedings.

The Board also maintains that the fourth prong of collateral estoppel is satisfied because Manson had a full and fair opportunity to litigate her claim of sex discrimination in the CSC proceeding. Pursuant to *Cohen,* we examine the financial amount at risk and the type of procedural rules that govern the different proceedings. The Board argues that the amount in controversy was greater in the CSC proceeding than in the subsequent PHRC proceeding. Conversely, the PHRC asserts that the amount in controversy was greater in the subsequent PHRC proceeding. However, both the CSA and PHRA provide employees with back-pay and reinstatement should their claims prevail; [16] accordingly, we conclude that the amount in controversy between the CSA and PHRA is substantially similar.

The Board further argues that the CSC and PHRC's procedures are similar in nature. However, the PHRC contends that the governing rules of the PHRC are fundamentally different from those of the CSC. Both the CSC and PHRC have the power to conduct investigations,[17] hold public hearings,[18] and subpoena witnesses

---

**16.** Section 952(c) of the CSA states:

In the case of any employee removed, furloughed, suspended, or demoted, the commission may modify or set aside the action of the appointing authority. Where appropriate, the commission may order reinstatement, with the payment of so much of the salary or wages lost, including employee benefits, as the commission may in its discretion award.

71 P.S. § 741.952(c). In relevant part, section of 9(f)(1) the PHRA similarly provides: If the [PHRC] shall find that a respondent has engaged in ... any unlawful discriminatory practice ... the [PHRC] shall issue ... an order requiring such respondent to cease and desist from such unlawful discriminatory practice and to take such affirmative action, including, but not limited to, reimbursement of certifiable travel expenses in matters involving the complaint, compensation for loss of work in matters involving the complaint, hiring, reinstatement or upgrading of employees, with or without back pay, admission or restoration to membership in any respondent labor or-

ganization ... and any other verifiable, reasonable out-of-pocket expenses caused by such unlawful discriminatory practice....
43 P.S. § 959(f)(1). Section 9(f)(1) was added by the Act of October 11, 1967, P.L. 426.

**17.** Section 203(3), (4) of the CSA, 71 P.S. § 741.203(3), (4) provides that the CSC may make investigations on its own motion, on the petition of a citizen, or at the request of the Governor or legislature. Section 7(f)-(f.2) of the PHRA, 43 P.S. § 957(f)-(f.2) provides that the PHRC, may investigate complaints of unlawful discriminatory practices where a complaint has been filed, where no complaint has been filed, or on the request of the Governor. Section 9(f)(2) was added by the Act of October 11, 1967, P.L. 426.

**18.** 4 Pa.Code § 105.11 provides that hearings before the CSC related to demotion, furlough, resignation, removal, suspension, or allegations of discrimination shall be public. 16 Pa.Code § 42.101 provides that if conciliation, persuasion, or conference fails to elimi-

and documents,[19] and both allow for pre-trial conferences.[20] Additionally, both the CSC and PHRC require the complaining party to carry the burden of establishing the charge of discrimination, and both provide the appointing authority or employer an opportunity to rebut the charges after the complainant has established a *prima facie* case. As a result, we conclude that the procedures available in both CSC and PHRC proceedings are substantially similar.

The fifth and final prong of collateral estoppel, i.e., that the determination in the prior proceeding was essential to the judgment, is also satisfied as the CSC made a specific finding that Manson failed to establish that her termination was the result of sex discrimination. Having concluded that the issue in each proceeding, whether the Board discriminated on the basis of sex, was identical and that the procedures applicable to each agency's hearing are substantially similar, and that the other prongs of the test to apply collateral estoppel have been met, we hold that the doctrine of collateral estoppel bars the PHRC from relitigating Manson's claim of sex discrimination against the Board.

Accordingly, we reverse, and we remand this matter to the PHRC with instructions to enter an order granting the Board's motion to dismiss.

### ORDER

AND NOW, this 22nd day of February, 2013, the interlocutory order of the Pennsylvania Human Relations Commission, dated September 27, 2011, is hereby reversed. This matter is remanded to the Pennsylvania Human Relations Commission with instructions to grant the motion to dismiss filed by the Pennsylvania Board of Probation and Parole.

Jurisdiction relinquished.

nate the unlawful discriminatory practice complained of, the PHRC may hold a public hearing on the matter.

19. *Section 209 of the CSA, 71 P.S. § 741.209* provides that the CSA has the power to subpoena the attendance and testimony of witnesses as well as the production of books and papers. 16 Pa.Code § 42.48 provides that the PHRC has the power to subpoena documents and the testimony of witnesses.

20. 4 Pa.Code § 105.14d provides that the CSC may schedule a pre-trial conference and request the parties to participate in the proceeding. Section 9(c) of the PHRA, 43 P.S. § 959(c) provides that the PHRC must endeavor to eliminate the unlawful discriminatory practice complained of by conference.