IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mark A. Emmett,                                :
                        Petitioner             :
                                               :   No.  63 C.D. 2016
                v.                             :
                                               :   Submitted:  October 14, 2016
State Civil Service Commission                 :
(Pennsylvania Liquor Control Board),           :
                        Respondent             :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE JAMES GARDNER COLINS, Senior Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                              FILED:  May 10, 2017


          Mark A. Emmett (Petitioner) petitions, *pro se*, for review of the December 15, 2015 order of the State Civil Service Commission (Commission), which dismissed his appeal and sustained the Pennsylvania Liquor Control Board's (PLCB) action to remove Petitioner from his position as district manager.


**Facts and Procedural History**

          By letter dated May 14, 2014, the PLCB suspended Petitioner from his position as a district manager pending the completion of an investigation based on the following charges:   conduct unbecoming a Commonwealth employee in that Petitioner was present at the Mohegan Sun Casino during work hours and used a state

vehicle for the same; and falsification of mileage reports and leave records. The suspension was effective close of business May 12, 2014, and advised Petitioner that he may appeal the suspension to the Commission within twenty days of receipt of the letter, that an investigation will be performed during the course of his suspension, and that the charges may result in a recommendation to discharge him from his position. (Reproduced Record (R.R.) at 1-2.)

Petitioner appealed his suspension to the Commission, asserting that there was no just cause for his suspension and that his suspension violated the Americans with Disabilities Act[1] and the Pennsylvania Human Relations Act[2] because no accommodation was made for his gambling addiction. Petitioner also asserted that his suspension violated section 951 of the Civil Service Act (Act).[3] (R.R. at 3-4.)

By letter dated June 3, 2014, Petitioner was advised that a recommendation for disciplinary action up to and including removal had been submitted against him based on the following charges:

> 1. Conduct unbecoming a Commonwealth employee; [i]n that on but not limited to January 9, 10, 16, 21, 23, 27, February 18, 19, 21, 24, 26, March 3, 5, 6, 7, 10, 13, 17, 19, 20, 24, 31, April 2, 4, 11, 16, 17, 28, 30, May 4 and 6, 2014 you were at the Mohegan Sun Casino where your player's card was used during working hours while utilizing a state vehicle for non-work related reasons, which brought the Commonwealth into disrepute.

---

[1] 42 U.S.C. §§12101-12213.

[2] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§951-963.

[3] Act of August 5, 1941, P.L. 752, *as amended*, 71 P.S. §741.951.

2. Falsification of records despite prior related instruction; [i]n that you falsified:

A) Leave records by your failure to request leave for time not worked on but not limited to January 9 (7.50 hours), January 10 (.50 hour), January 16 (.50 hour), January 21 (2.25 hours), January 23 (5.25 hours), January 27 (7.50 hours), February 18 (.75 hours), February 19 (5.50 hours), February 21 (1.50 hours), February 24 (4.50 hours), February 26 (1 hour), March 3 (5.25 hours), March 5 (.25 hour), March 6 (3.75 hours), March 7 (2.50 hours), March 10 (.25 hour), March 13 (.25 hour), March 17 (.50 hour), March 19 (7.50 hours), March 20 (1.25 hours), March 24 (2 hours), March 31 (1 hour), April 2 (4.75 hours), April 4 (7 hours), April 11 (7.50 hours), April 16 (1 hour), April 17 (7.50 hours), April 28 (1.50 hours), April 30 (.25 hour), May 4 (3 hours) and May 6, 2014 (6.25 hours).

B) Monthly Automotive Report (STD-554) for the months of January, February, March, April and May, 2014 by completing the reports with inaccurate mileage and destinations.

3. Undependability despite prior related instruction; [i]n that you were absent without leave on but not limited to January 9 (7.50 hours), January 10 (.50 hour), January 16 (.50 hour), January 21 (2.25 hours), January 23 (5.25 hours), January 27 (7.50 hours), February 18 (.75 hour), February 19 (5.50 hours), February 21 (1.50 hours), February 24 (4.50 hours), February 25 (1 hour), March 3 (5.25 hours), March 5 (.25 hour), March 6 (3.75 hours), March 7 (2.50 hours), March 10 (.25 hour), March 13 (.25 hour), March 17 (.50 hour), March 19 (7.50 hours), March 20 (1.25 hours), March 24 (2 hours), March 31 (1 hour), April 2 (4.75 hours), April 4 (7 hours), April 11 (7.50 hours), April 16 (1 hour), April 17 (7.50 hours), April 28 (1.50 hours), April 30 (.25 hour), May 4 (3 hours) and May 6, 2014 (6.25 hours).

(Certified Record (C.R.) at No. 1, Exhibit AA-13.)

Petitioner was also advised that a fact-finding meeting was scheduled for June 6, 2014, to discuss the charges against him, that he would have an opportunity to respond to the charges, and that discipline may or may not be imposed depending on the outcome of the meeting.

By memorandum dated June 9, 2014, Jerome Yaeger, a PLCB regional manager, summarized the fact-finding meeting with Petitioner, in pertinent part, as follows:

> [Petitioner] stated that he was at the casino and did not dispute the days or hours listed. He also stated he worked longer days and through his lunch and would always work more than 37.50 hours each week. He stated if he didn't work 37.50 or more hours in a week, it would show in his stores and it doesn't. His stores are clean, his schedules and other District Manager responsibilities were always completed because he put in the hours to get the job done. He stated if he was out for an extended period of time he would call Sue Cobb and ask her to input his leave or he would call [the] Regional Office. He stated he never would check to see if his time was entered but that he has plenty of leave and would never intentionally falsify his time. He stated that he did not fill out his automotive report daily that he would do it at the end of the month, some of it by memory, so to say it is 100 percent accurate, it is probably not. He acknowledged he shouldn't have taken the state car to the casino. He stated part of his illness is bending the truth and he is truly sorry and just wants a second chance. He feels he has a good support system at home and is going to therapy to deal with his gambling addiction. He has also signed papers so it is illegal for him to enter any casino in the state.
>
> Lori Bornman offered [Petitioner] a PLCB-771 and at that time [Petitioner] stated he retained an attorney and did not sign the PLCB-771.

(C.R. at No. 1, Exhibit AA-14.)

By letter dated June 26, 2014, the PLCB affirmed Petitioner's suspension and removed him from his position effective July 2, 2014. Petitioner appealed the PLCB's determination to the Commission, asserting that his discharge violated the Americans with Disabilities Act and the Pennsylvania Human Relations Act, and also alleging discrimination under section 905a of the Act, *added by* section 25 of the Act of August 27, P.L. 1257, based on other non-merit factors. Thereafter, the Commission conducted a hearing.[4]

Michael O'Toole, a special investigator for the PLCB, testified that he received a request to investigate Petitioner on April 17, 2014, when Charles Mooney, the PLCB's retail operations manager, advised him that Mooney had received an anonymous complaint that Petitioner was at the Mohegan Sun Casino with a state vehicle. According to O'Toole, he went to the casino to verify the complaint and met

---

[4] By letter dated September 15, 2014, Petitioner requested, *inter alia*, the disciplinary records, or a summary thereof, of the penalties assessed against PLCB employees in the last five years for violation of any of the policies that Petitioner was alleged to have violated. (R.R. at 39-40.)

On October 23, 2014, Petitioner filed a motion with the Commission seeking to compel discovery of his request for disciplinary information. By letter dated October 24, 2014, the Commission denied Petitioner's motion, reasoning that the PLCB had substantially complied with his discovery request and any remaining requests were overbroad or irrelevant. The Commission's letter also noted that there was no discrimination claim before it and, therefore, PLCB's offer to provide records relative to the specific examples alleged in Petitioner's appeal was reasonable and appropriate. (R.R. at 34-37.)

On December 8, 2014, Petitioner requested the issuance of subpoenas for fourteen individuals, alleging that they were expected to testify regarding their violations of the Liquor Code, Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 1-101 – 10-1001, the PLCB Code of Ethics, and their respective discipline under the same. (R.R. at 28-32.) By letter dated December 17, 2014, the Commission denied Petitioner's request because his claim did not arise under section 951(b) of the Civil Service Act, and his request did not indicate that the proposed witnesses were similarly situated. (R.R. at 33.)

with a state trooper, Keith Macauley, who stated that he had received a similar anonymous call regarding Petitioner, and Thomas Wascura, the casino's compliance representative. O'Toole explained that he proceeded to the control room with Trooper Macauley and Wascura, retrieved information from Petitioner's player's card, and ran his day's activity through the computer. He further explained that, after running Petitioner's information, he observed video footage of Petitioner at times when, to the best of O'Toole's knowledge, Petitioner should have been at work. O'Toole testified that he requested copies of the footage from the casino. (R.R. at 269-74.)

O'Toole further testified that on May 6, 2014, Mooney advised him that he received another complaint regarding Petitioner. O'Toole explained that he contacted the casino and asked it to save any relevant video; however, he noted that the casino was unable to obtain any footage of the parking lot area where Petitioner's state vehicle was located. (R.R. at 274.)

John Gutkowski, director of operational accounting at Mohegan Sun Casino, testified that a player's card is a loyalty card assigned to casino patrons, which allows them to earn rewards that may be redeemed at the casino. He further testified that information on the player's card can be used to generate documents indicating when and where an individual played, and that information may be used with the casino's video surveillance system to observe a location where a card was used. (R.R. at 280-84.)

Benjamin Iverson, director of surveillance at Mohegan Sun Casino, testified regarding the casino's capability to use the video surveillance system to observe locations where a player's card was used and explained that he performed

that function for the dates of April 17, 2014, and May 6, 2014, pursuant to O'Toole's request and provided the records to the PLCB. (R.R. at 292-97.)

Mooney testified that he was Petitioner's reviewing officer, but not direct supervisor. He explained that Petitioner was a district manager, which required him to supervise a set of stores and their operations. Mooney further explained that Petitioner's position required significant travel and, therefore, each district manager was assigned a vehicle. Indeed, Mooney testified that Petitioner's district was one of the largest geographically. Mooney also noted that, because of the significant travel inherent in the position, district managers enjoy a lot of freedom, minimal supervision, and discretion in when they do their job. For example, Mooney stated that certain stores in Petitioner's district are open during hours other than regular business hours and confirmed that Petitioner is expected to perform his duties on weekends. Moreover, although Mooney confirmed that Petitioner, in effect, created his own schedule, he testified that normal business hours are from 8:00 a.m. to 5:00 p.m. and a district manager is expected to be at work during those hours. (R.R. at 300-03, 313-16, 323-24.)

Mooney further testified that he was advised on April 17, 2014, that consumer affairs had received an anonymous complaint and was adamant that someone return the call. Mooney explained that he returned the call and was notified that Petitioner had been at the Mohegan Sun Casino all day. Mooney stated that he discussed the complaint with his supervisor, and subsequently asked O'Toole to investigate. Mooney testified that he also spoke with Lori Bornman, the chief of labor relations for the PLCB, and someone from the chief counsel's office to get assistance in obtaining certain records. (R.R. at 303-05.)

7

Mooney explained that he received another complaint on May 6, 2014, involving the same anonymous caller alleging that Petitioner was at Mohegan Sun Casino and that he directed O'Toole to investigate. Mooney testified that he inquired with Petitioner's direct supervisor, Yeager, whether Petitioner was on any type of approved leave. According to Mooney, Yeager had no record of Petitioner being approved leave for any of the dates in question. (R.R. at 304-06, 321.)

Mooney testified that he received another complaint from the same anonymous caller on May 12, 2014, again alleging that Petitioner was at the Mohegan Sun Casino. Mooney stated that he again consulted with Bornman and, along with Yeager, they decided to suspend Petitioner without pay and benefits pending an investigation. Mooney explained that he then called Petitioner to ask him to meet at a store location the following day. According to Mooney, he and Yeager met with Petitioner the next day and informed him that he was being suspended. Mooney explained that Yeager began reading Petitioner the suspension letter when Petitioner advised him that there was no reason to continue because the information alleged was true. Mooney explained that, at that point, he drove Petitioner's state vehicle to Harrisburg and Yeager drove Petitioner home. According to Mooney, he received a phone call from Petitioner while transporting the vehicle. He stated that Petitioner was upset and asked Mooney to make sure he did not lose his job. (R.R. at 307-10.)

Mooney further testified that he completed a summary of his role in the investigation and suspension of Petitioner and recommended that Petitioner be permanently removed from his position. Mooney stated that, sometime after the memo, he received another phone call from Petitioner where he admitted to being at the casino, apologized, and said that he really needed his job. (R.R. at 310-13.)

8

Mooney stated that he never received a complaint that Petitioner was not performing his duties during the period from January 2014 to May 2014. Indeed, Mooney testified that he believed Petitioner was a good district manager and that he, as well as others, gave Petitioner positive reviews on his performance evaluations. According to Mooney, he was unaware of any period during the investigation when Petitioner worked less than the required amount of time and confirmed that Petitioner performed his 37.5 hours per week, sometimes on weekends and sometimes during evenings. Mooney explained that Petitioner was authorized to call the office and report off for illness, personal leave, or annual leave; however, he clarified that the request must be relayed to the regional office. Mooney further explained that, if a district manager was performing an evening visit to a store, the policy was to notify the regional office of the same. According to Mooney, Petitioner did not notify the regional office that he would be performing evening visits on the dates when he was at the casino. (R.R. at 316-25.)

Yeager testified that he supervises district managers in his region, including Petitioner, and that there is a lot of freedom and trust in the position. Yeager explained that district managers are allowed some flexibility in their workday to facilitate doing store business at various hours and confirmed that district managers must call the regional office and indicate what schedule they will work on a particular day when flexing their schedules. He noted that Petitioner would call his office if he had flexed his schedule on the dates in question and stated that he was unaware of Petitioner doing the same. (R.R. at 327-29.)

Yeager further testified that he was present for Petitioner's suspension on May 12, 2014. He explained that Mooney asked him whether Petitioner was on any type of comp time and he indicated that Petitioner was not. Yeager stated that he

9

discussed with Mooney that they would suspend Petitioner and subsequently instructed Petitioner to meet at a store. He explained that, at the meeting, Mooney advised Petitioner he was being suspended without benefits, began reading the suspension letter, and Petitioner stopped him and told them the information alleged was true. Yeager further explained that he took Petitioner's keys, his purchasing card and anything else related to his job, and drove Petitioner home. According to Yeager, he allowed Petitioner to call Mooney and other individuals during the drive. Yeager noted that, at one point, Petitioner told him that he was at the casino, that he was sorry, and asked whether Yeager could save his job. (R.R. at 330-35.)

Yeager stated that a letter was sent to Petitioner scheduling a fact-finding meeting. He explained that the notice sent to Petitioner contained charges more expansive than the initial charges; specifically, Yeager noted that the notice included additional dates when Petitioner was at the casino and that Bornman's assistance was used in formulating the charges. Yeager further testified that Petitioner was a good employee, that he never had any problems with Petitioner, that he always completed his job duties, and that Petitioner's flexible schedule did not impact his duties. (R.R. at 335-42.)

Ester Cobb testified that she was Petitioner's secretary and that her work consists largely of clerical duties and support of the district manager. She stated that she entered Petitioner's leave as part of her duties and always entered leave when asked to do so. Cobb further testified that she occasionally had trouble reaching Petitioner during work hours and that she frequently received calls from Petitioner's superiors and store employees looking for him because they could not reach him; however, she clarified that Petitioner would always call or text her back. Because of the difficulty in reaching Petitioner, Cobb explained that she asked him to check in

10

with her and confirmed that he initially complied with her request. According to Cobb, Petitioner did not ask her to submit leave for the dates when he was at the casino. Cobb noted that Petitioner was a good guy, that he treated her like gold, and never asked her to lie for him or do anything that she felt was improper; however, she acknowledged that Petitioner called her after he was discharged and asked her to tell his supervisors that he had directed her to enter leave for him, although Cobb testified that he did not actually request that she enter leave. (R.R. at 346-59.)

Bornman testified that her office is responsible for a variety of employment issues regarding store employees and noted that she performed an investigation of Petitioner. Bornman explained that Mooney approached her on April 17, 2014, and advised her that he had received an anonymous complaint regarding Petitioner and instructed O'Toole to investigate. Bornman also stated that Mooney approached her on May 6, 2014, and advised her that he had received another complaint. She explained that, at this time, the casino had provided verbal verification that Petitioner had been at the casino, but she was still waiting for it to provide the requested documentation. She noted that, on May 12, 2014, Mooney advised her that he had received a third phone call and, at this point, they decided to suspend Petitioner, although she acknowledged that she was still waiting for documentation from the casino. Bornman explained that she received the records from the casino shortly after Petitioner's suspension, although the records only spanned January 2014 to May 2014 because the casino advised her that her original request was too voluminous. (R.R. at 360-63, 369.)

Bornman confirmed that, in the letter promoting Petitioner to district manager in June 2011, he was advised that his regularly scheduled work hours were 8:00 a.m. to 4:30 p.m. According to Bornman, she compared the records she

received from the casino to Petitioner's regularly scheduled hours to determine whether any of the time at the casino conflicted with his regular working hours. Bornman stated that she also searched for leave records for the relevant dates and times and confirmed that none were submitted. However, she explained that she discovered one change to Petitioner's schedule where he requested a day off and rescheduled work for a Sunday, May 4, 2014, although the casino records indicated that Petitioner was actually at the casino that day. Bornman testified that she also viewed video footage the casino provided from April 17, 2014, and May 6, 2014, and confirmed that Petitioner was the individual on the footage using his player's card. (R.R. at 364-76.)

Bornman testified that she also reviewed whether Petitioner accurately reported his mileage on the dates when he was at the casino. She explained that the relevant policy provides that failing to timely submit completed forms or intentionally falsifying data may result in discipline. Additionally, Bornman stated that operators of a state vehicle must document vehicle usage daily by completing a form and indicating the total business, personal, and commute mileage. She stated that she reviewed Petitioner's mileage and observed a number of instances where Petitioner indicated that he travelled from his residence to his office and back to his residence, but the submitted mileage was inconsistent and resulted in substantial discrepancies. More specifically, Bornman explained that she used MapQuest to determine the actual mileage of that route and was provided with three alternatives. She noted that the shortest route was approximately 200 miles and substantially exceeded Petitioner's submitted purported mileage, indicating that it was not possible that he actually completed the purported route and that he falsified the records. Indeed, some of the days where Petitioner indicated that he had been travelling

12

coincided with dates when he was at the casino. Moreover, she explained that vehicle operators are not authorized to use Commonwealth vehicles for travel to entertainment facilities unless the trip is in connection with an employee's official duties. According to Bornman, a casino is considered an entertainment facility and there was no business reason for him to be there. (R.R. at 376-89.)

Bornman further testified that, on January 9, 2014, Petitioner's player's card was initially used at 7:59 a.m. and last used at 5:30 p.m., although there was no indication that he had taken comp time or made a change to his schedule for that day. She noted that, on his daily mileage report, Petitioner indicated that he travelled from his residence in Carbondale, to a store in Selinsgrove, to another store in Lewisburg, and back to his residence; however, Petitioner reported that he travelled only 139 miles, which she believed was unusually low for that route. Consequently, Bornman used MapQuest and determined that Petitioner underreported his mileage by approximately eighty-seven miles. As such, she concluded that the mileage was falsified and that Petitioner did not actually visit those stores that day because he was at the casino. In addition to Petitioner's daily mileage report, Bornman also reviewed an inspection report for the Selinsgrove store where he purportedly visited that day and concluded that the information in the report could not be accurate. For example, the report identified a Ms. Morgante as the person in charge of the store when Petitioner visited. Bornman confirmed that Morgante worked that day from 8:30 a.m. to 3:45 p.m., which fell within the timeframe that Petitioner's player's card was being continuously used at the casino. However, Bornman concluded that the inspection report was falsified because, although the store was open until 9:15 p.m. and Petitioner could have conceivably travelled there after he left the casino, Morgante

13

would not have been in charge at that time because her shift had ended at 3:45 p.m. (R.R. at 392-405.)

Bornman explained that, after she completed her investigation, she drafted the charges contained in the notice of fact-finding letter to Petitioner, which included all dates where she observed mileage discrepancies and when he had been at the casino during regular working hours. According to Bornman, Petitioner advised her at the fact-finding meeting that he was not disputing any of the dates that he was at the casino and conceded that his state vehicle was there and should not have been. Bornman also stated that Petitioner advised her that he did not execute his mileage report daily; instead, he completed it from memory and acknowledged that it was probably not one-hundred percent accurate. (R.R. at 405-07.)

Bornman further testified that she drafted the letter to Petitioner advising him of his dismissal, which included the same charges that were discussed at the fact-finding meeting. She explained that the first charge, conduct unbecoming a Commonwealth employee despite prior related instruction, was based on the mileage report and discrepancies throughout the whole investigation. Bornman conceded that Petitioner was not instructed regarding his conduct after it was discovered, but explained that the manual he was given when he was issued the state vehicle had instructed him accordingly. Regarding the second charge, falsification of records, she explained that it was based on the discrepancies in Petitioner's mileage reports. Bornman testified that the third charge, undependability, was based on the casino records indicating that Petitioner was present during regular business hours. Bornman confirmed that Petitioner's discipline was consistent with what is typical for those charges and noted that Petitioner is held to a higher standard of conduct as a district manager with significant freedom. (R.R. at 407-18.)

14

Petitioner testified that he was employed by the PLCB for twenty-nine years, worked his way from a part-time liquor store clerk to a district manager, and had been promoted six times. Petitioner stated that he was a good district manager, that he did his best to follow the rules and regulations, and that he never received a less than satisfactory performance evaluation. Petitioner acknowledged that he visited the casino thirty-one times in approximately five months and explained that he did so because he received free slot plays and would visit on his way to work. He testified that the visits did not interfere with the performance of his duties and, in fact, he noted that he opened a new store in Bellefonte during the period in question. (R.R. at 423-30.)

Petitioner further testified that the PLCB never advised him to not visit the casino or prohibited him from doing so. He explained that, if he spent a full day at the casino, he would request time off of work for that day. According to Petitioner, he would call his secretary and ask her to submit his request for time off or, if he had access to his computer, he would personally submit his time off. However, he conceded that there were instances when he attempted to call the regional office to submit his leave but was unable to do so and did not email the regional office because he was in his vehicle. In those situations, Petitioner explained that he would work through his lunch or extend his work hours to compensate for the time spent at the casino. Petitioner acknowledged that he was held to a higher standard of conduct and was supposed to enforce policies for his subordinates. Petitioner stated that, after April 17, 2014, no one advised him to stop visiting the casino and, if someone had, he would have taken the steps he ultimately took to address the situation; that is, execute a lifetime self-exclusion from gaming activities because of his gambling addiction. (R.R. at 430-33, 439-41.)

15

Petitioner also testified that he believes the PLCB treated him unfairly because he was never given an opportunity to stop going to the casino notwithstanding that other employees were offered different opportunities than he was despite allegations against them. Moreover, Petitioner explained that he was aware of other instances when Commonwealth vehicles were used by PLCB employees for personal use during Commonwealth time, such as for funerals and by district managers' parents. Petitioner acknowledged that he was given a manual and policy when he received his Commonwealth vehicle that prohibited him from using the vehicle to visit an entertainment facility; however, he explained that the casino was not around when he received the vehicle and he was never trained regarding the policy. Petitioner also maintained that he never intentionally falsified mileage reports. He explained that he traveled over 4,000 miles per month, has used a Commonwealth vehicle for eight years, and was never previously questioned about his mileage, although he conceded that the policy requires mileage reports to be executed daily and he did not do so. Additionally, he acknowledged that he never identified the casino as a destination on his mileage reports. Petitioner further explained that there were occasions when construction would shut down the highway for hours, he would be stuck in a poor cellphone reception area, and he would be forced to change his route because he knew the intended store would be closed when he arrived. (R.R. at 434-35, 438-39, 441-42.)

In addition, Petitioner stated that he believed he was always on call because he was one of the few individuals who transferred the office phone to his personal cell phone. According to Petitioner, whenever a call came in, he always received it, responded to the call, and never received a complaint. (R.R. at 436-37.)

16

By decision mailed December 15, 2015, the Commission dismissed Petitioner's appeal challenging his removal and sustained the PLCB's discharge. Among other things, the Commission expressly found that: Petitioner's work hours were from 8:00 a.m. to 4:30 p.m.; Petitioner must notify Yeager if he is not going to be at an assigned location; an employee who is issued a Commonwealth vehicle must document his mileage daily using a mileage report; and employees issued Commonwealth vehicles may not use it to travel to entertainment facilities, such as a casino. (Commission's Findings of Fact at Nos. 11, 13, 15, 17.) Accordingly, the Commission concluded, in pertinent part:

> Upon review of the record, the Commission finds that the appointing authority has presented sufficient evidence to support the charges. As a managerial employee, [Petitioner] is held to a higher standard of conduct. We find O'Toole, Mooney, Yeager, Cobb, and Bornman credible regarding [Petitioner's] repeated attendance at a casino, misuse of the Commonwealth vehicle, negligent and continued failure to properly input leave, and falsification of his Monthly Automotive Reports and an inspection report. [Petitioner] acknowledges that he was at the casino on the dates in question and did not properly record his work-related mileage. [Petitioner's] inability to properly conduct his job duties by being available during work hours, combined with his misuse of a Commonwealth vehicle and falsification of records clearly impacts negatively upon his ability to perform his job duties.

(Commission adjudication at 18-19) (footnote omitted).

Petitioner appealed the Commission's decision to this Court.

On appeal,[5] Petitioner argues that the Commission erred in sustaining the PLCB's action to discharge him because it failed to establish just cause. Specifically,

---

[5] "This Court's scope of review of a decision of the Commission is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, or **(Footnote continued on next page…)**

Petitioner asserts that: the PLCB failed to establish that Petitioner's visits to the casino occurred during working hours or brought the PLCB into such disrepute as to warrant removal; the PLCB failed to establish that he intentionally falsified records because it did not prove that he acted with wrongful intent; the introduction and admission of MapQuest data was improper and insufficient to prove that he intentionally falsified mileage reports; and the PLCB failed to establish that Petitioner was undependable. Moreover, Petitioner argues that the Commission violated his due process rights under the United States and Pennsylvania Constitutions because it precluded him from introducing evidence to support his claim that he received a more severe punishment than other PLCB employees who committed similar offenses.

## Discussion

Before addressing the merits of the present controversy, we must consider whether this Court has jurisdiction over this matter. More specifically, we must determine whether Petitioner's petition for review was timely filed.

Pennsylvania Rule of Appellate Procedure (Pa. R.A.P.) 1512(a)(1) provides that "[a] petition for review of a quasijudicial order, or an order appealable under 42 Pa.C.S. § 763(b) (awards of arbitrators) or under any other provision of law,

---

**(continued…)**

whether substantial evidence supports the necessary findings of fact made by the Commission." *Webb v. State Civil Service Commission (Department of Transportation)*, 934 A.2d 178, 184 n.2 (Pa. Cmwlth. 2007). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion without weighing the evidence or substituting the judgment of the Commission." *Quinn v. State Civil Service Commission*, 703 A.2d 565, 571 (Pa. Cmwlth. 1997).

18

shall be filed with the prothonotary of the appellate court within 30 days after the entry of the order."

Here, the Commission's order was mailed on December 15, 2015. Accordingly, pursuant to Pa. R.A.P. 1512(a)(1), Petitioner's petition for review was due by January 14, 2016. However, Petitioner filed his petition for review on January 19, 2016, thereby rendering his petition untimely and precluding this Court from exercising jurisdiction over the same. Therefore, because Petitioner's petition for review was untimely filed, said petition must be quashed.

However, even if the petition for review was timely filed, Petitioner's arguments would still fail.

Section 807 of the Act provides that "[n]o regular employe in the classified service shall be removed except for just cause." 71 P.S. §741.807. "The appointing authority bears the burden of proving just cause for removal." *Webb v. State Civil Service Commission (Department of Transportation)*, 934 A.2d 178, 188 (Pa. Cmwlth. 2007). To establish just cause, "the appointing authority must demonstrate that the actions resulting in the removal are related to an employee's job performance and touch in some rational and logical manner upon the employee's competence and ability." *Pennsylvania Board of Probation and Parole v. State Civil Service Commission*, 4 A.3d 1106, 1112 (Pa. Cmwlth. 2010). In other words, "[j]ust cause for removal must be merit related." *Thompson v. State Civil Service Commission*, 863 A.2d 180, 184 (Pa. Cmwlth. 2004). "Merit-related criteria include whether the employee failed to properly execute his duties or has acted in such a way that hampers or frustrates the execution of his duties." *Id*. Additional factors to consider when determining whether just cause exists are the nature of the job and whether the conduct alleged demonstrates a lack of judgment that erodes confidence

19

in the employee's character. *City of Philadelphia v. Civil Service Commission (Johnson)*, 967 A.2d 1034, 1039 (Pa. Cmwlth. 2009) (citing *City of Philadelphia v. Philadelphia Civil Service Commission (Carter)*, 895 A.2d 87, 92-93 (Pa. Cmwlth.), *petition for allowance of appeal denied*, 909 A.2d 306 (Pa. 2006)).

The credibility of witnesses, resolution of conflicting testimony, and the drawing of inferences are within the province of the Commission. *Benjamin v. State Civil Service Commission*, 332 A.2d 585, 588 (Pa. Cmwlth. 1975). "[T]his Court will not re-weigh the evidence or substitute its judgment even though it might have reached a different factual conclusion." *Thompson*, 863 A.2d at 184. This Court may not disturb a finding unless it is unsupported by substantial evidence. *Quinn v. State Civil Service Commission*, 703 A.2d 565, 571 (Pa. Cmwlth. 1997).

First, Petitioner argues that the PLCB failed to establish that he was at the casino during working hours or brought the PLCB into such disrepute as to warrant discharge. According to Petitioner, injury to the PLCB's reputation alone is insufficient to constitute just cause for discharge. Moreover, Petitioner asserts that gambling at a casino does not render him unfit to be a district manager, that he does not have normal working hours, and that his history of positive performance reviews and promotions indicate his competency and ability to perform his duties.

Here, as an initial point, Petitioner does not dispute that he was at the casino during the times and dates alleged and Bornman testified that, in the letter promoting Petitioner to the district manager position, he was advised that his regularly scheduled work hours were 8:00 a.m. to 4:30 p.m. The Commission found Bornman credible. This evidence constitutes substantial evidence supporting the Commission's finding that Petitioner's work hours were 8:00 a.m. to 4:30 p.m. As such, Petitioner's assertion that he was not present at the casino during work hours as

20

he did not have normal working hours is unpersuasive because the Commission is charged with resolving conflicting testimony.

Regarding Petitioner's fitness to perform his duties based on his presence at the casino during work hours, Mooney testified that a district manager is expected to be at work during normal business hours. Yeager explained that a district manager must notify the regional office if he wants to modify or flex his schedule and there was no evidence indicating Petitioner attempted to do so. Moreover, Cobb testified that Petitioner's superiors and store employees frequently contacted her looking for Petitioner because they could not reach him. The Commission found these witnesses credible.

Importantly, the nature of Petitioner's position involves a significant amount of freedom and discretion, with minimal supervision. Petitioner's abuse of that autonomy indicates a lack of judgment that erodes confidence in his character. Similarly, Petitioner's failure to comply with the policy governing schedule modification suggests Petitioner failed to properly execute his duties. As such, we discern no error in the Commission's determination that Petitioner's discharge for just cause was proper because his attendance at the casino during work hours hampered or frustrated the execution of his duties and was sufficiently related to his competence and ability to perform the same.

Further, we are unpersuaded by Petitioner's argument that his history of promotions and positive performance reviews indicate his ability to perform his duties because the charges alleged only pertained to the period from January 2014 to

May 2014; they did not span Petitioner's entire tenure with the PLCB and his prior performance is irrelevant.[6]

Next, Petitioner argues that the Commission violated his due process rights under the United States and Pennsylvania Constitutions because he was precluded from obtaining and presenting evidence supporting his claim that he received a more severe punishment than other PLCB employees who committed similar offenses.

However, because this issue was not raised before the Commission, it is waived and may not be raised for the first time on appeal. 2 Pa.C.S. §703(a); *see also Thompson v. State Civil Service Commission*, 863 A.2d 180, 183 n.1 (Pa. Cmwlth. 2004).

Accordingly, we quash Petitioner's petition for review as untimely filed. Alternatively, even if the petition was not quashed, Petitioner's arguments are unpersuasive because substantial evidence supports the Commission's determination that Petitioner's discharge for just cause was proper because his attendance at the casino during work hours hampered or frustrated the execution of his duties and was sufficiently related to his competence and ability to perform the same.

_____
PATRICIA A. McCULLOUGH, Judge

---

[6] Based on our determination that the Commission's decision sustaining the PLCB's discharge of Petitioner for just cause was proper because his conduct was unbecoming a Commonwealth employee in that he was present at the casino during work hours, we need not address each additional ground for discharge and Petitioner's argument thereto.

22

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mark A. Emmett,                                  :
              Petitioner                        :
                                            :   No.  63 C.D. 2016
            v.                                       :
                                              :
State Civil Service Commission                   :
(Pennsylvania Liquor Control Board),             :
                    Respondent               :

## *ORDER*

AND NOW, this 10th day of May, 2017, the petition for review filed by Mark A. Emmett is hereby quashed.

 

_____
PATRICIA A. McCULLOUGH, Judge