**PENNSYLVANIA BOARD OF PROBATION AND PAROLE, Petitioner**

v.

**STATE CIVIL SERVICE COMMISSION (Manson), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs May 14, 2010.
Decided Aug. 18, 2010.

Linda J. Laub, Deputy Chief Counsel and Victoria Madden, Chief Counsel, Harrisburg, for petitioner.

Rhonda Manson, respondent, pro se.

BEFORE: PELLEGRINI, Judge, and SIMPSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Senior Judge FRIEDMAN.

The Pennsylvania Board of Probation and Parole (Board or Appointing Authority) petitions for review of the September 15, 2009, order of the State Civil Service Commission (Commission), which set aside the Board's action removing Rhonda Y. Manson from her position as a Parole Agent II, regular status, and imposed a thirty-day suspension, without back pay or benefits, on Manson. The Commission concluded that the Board did not meet its burden of proving just cause for Manson's removal pursuant to section 807 of the Civil Service Act [1], but did establish just

---

1. Act of August 5, 1941, P.L. 752, *as amended,* 71 P.S. § 741.807. Section 807 of the Civil Service Act provides that "[n]o regular employe in the classified service shall be removed except for just cause."

cause for Manson's suspension under section 803 of the Act.[2] We affirm.

For approximately five years, Manson was employed as a Parole Agent II in the Appointing Authority's Northeast Division. (Findings of Fact, No. 4.) In her position, Manson was authorized to carry a firearm and safety equipment, including Oleoresin Capsicum Spray (OC Spray) and a baton, which were issued to her by the Appointing Authority. (Findings of Fact, No. 7.) On August 14, 2008, Manson completed a "Loss of or Damage to Commonwealth Property or Equipment" form (Form) to report that her firearm was missing as of August 12, 2008. On the Form, Manson indicated that she looked for the firearm all day on August 13, 2008, and questioned everyone that lived in her house, as well as her friend "Robert," but no one knew where the gun was located. (Findings of Fact, Nos. 14–15; Manson's Ex. 3, R.R. at 228a.)

As a result of Manson's missing firearm, the Appointing Authority requested an investigation by its Office of Professional Responsibility (OPR). Frank Margerum, a special investigator with OPR, conducted the investigation, which included three separate interviews with Manson, and an interview with Manson's friend, Robert Thompson, a prior parolee who currently is an inmate at the State Correctional Institution at Rockview. (Findings of Fact, Nos. 16–19.) Based on the investigation, the Appointing Authority determined that Manson had deviated from Board policies regarding inappropriate employee relationships, proper firearm storage and the use of Board-issued firearm and safety equipment. The Appointing Authority then held a fact-finding conference with Manson; in addition to Manson and Manson's union representative, the conference was attended by Dennis Powell, District Director for the Appointing Authority's Philadelphia office, and Nina Ferguson, Deputy Director. When the fact-finding was complete, Brenda Estep, Director of Human Resources, approved Manson's removal. (Findings of Fact, Nos. 35–36; Appointing Authority's Ex. 6, R.R. at 290a.)

By letter dated January 7, 2009, the Board notified Manson that she was being removed from her position, effective at the close of business on January 7, 2009, based on her violation of section B.2 of the Board's Code of Conduct and her violations of Procedure 5.8 of the Board's Operations and Procedures Manual. Specifically, the Board stated as follows:

1. You violated the Board's Code of Conduct, Section B.2 when you maintained a private relationship with an individual under the Board's supervision.[3]
2. You violated the Board's Operations and Procedures Manual, Procedure 5.8,

---

2. This section of the Civil Service Act provides, in relevant part, as follows:
   An appointing authority may for good cause suspend without pay for disciplinary purposes an employe holding a position in the classified service. ... No person shall be suspended because of race, gender, religion or political, partisan or labor union affiliation. What shall constitute good cause for suspension may be stated in the rules.
   71 P.S. § 741.803.

3. Section B–2 of the Board's Code of Conduct provides, in relevant part, as follows:

There shall be no fraternization or private relationship of employes with clients, prospective clients, prison inmates, or family members of any of the preceding. ... "Prospective client" is defined as an individual under active supervision of the Board on special probation or special parole or a person who has been convicted of a crime and sentenced to a term of imprisonment under the Board's jurisdiction and who is awaiting parole consideration.
(Findings of Fact, No. 5; Appointing Authority Ex. 4, R.R. at 286a.)

Resistance and Control when you stored your Board-issued firearm in your home in a manner in which it was accessible to others.[4]

3. You violated the Board's Operations and Procedures Manual, Procedure 5.8, Resistance and Control when you failed to carry your Board-issued firearm and safety equipment at times required by Board policy.[5]

(Findings of Fact, Nos. 1–2; Commission's Ex. A, R.R. at 198a.)

Manson appealed her removal to the Commission pursuant to sections 951(a) and (b) of the Civil Service Act, 71 P.S. §§ 741.951(a) and (b), arguing that she was removed without just cause and that her removal was the result of gender-based discrimination. (Findings of Fact, No. 3; Commission Ex. B, R.R. at 200a–01a.) On March 27, 2009, the Commission held a public hearing on the matter. In support of its removal action, the Appointing Authority presented testimony from Thompson, Margerum, Powell, Gary Holland and Estep. Manson testified on her own behalf.

Regarding his relationship with Manson, Thompson testified that he had known Manson for over twenty years, and they lived next door to each other growing up. Thompson stated that he ran into Manson again in 2006 and learned that she was a parole agent, but he did not tell Manson that he had been incarcerated, and he did not know whether Manson had been told about it. (R.R. at 29a–31a.) Thompson said that he saw Manson more frequently in 2008; for a while, he went to her house more than twice a month and helped her out with various chores. (R.R. at 31a–34a.) According to Thompson, he stayed overnight at Manson's house once or twice, and he had sex with Manson on at least two occasions. (R.R. at 34a–35a.) Thompson testified that he last spoke with Manson in August or September of 2008, when Manson asked him to get his possessions and leave because her gun was missing and there was going to be an investigation. (R.R. at 35a–36a.)

Margerum testified about his investigation of Manson. Margerum stated that, during the first interview, Manson told him that she had received training in the

4. Procedure 5.8 provides, in relevant part, as follows:
IX. STORAGE OF WEAPONS
A. Employees are responsible for the safe storage and security of all Weapons not being carried by the Employee.
. . .
G. When in the home, and off duty, the Employee shall store the Weapons inside the Employee's residence in a safe location. The Employee shall ensure that the Board-issued firearm has the "Life Jacket" or Pistol lock in place and shall store the ammunition separately. The Employee shall ensure that the Weapons stored inside the home are not accessible to other residents or other individuals when being stored.
(Findings of Fact, Nos. 8–9; Appointing Authority's Ex. 1 at 9–10, R.R. at 244a–45a.)

5. Procedure 5.8 also provides, in relevant part, as follows:

VIII. AUTHORIZED WEAPONS AND SAFETY EQUIPMENT
E. Carrying the Board–Issued Firearm
1. Employees requesting permission to carry a Board-issued firearm and receiving authorization from the Board shall carry the firearm during parolee transports, on duty days and during planned arrests.
. . .
4. Employees authorized to carry the Board-issued firearm must carry the Board-issued OC Spray and/or Expandable Baton on the Employee's person when carrying the firearm. Both the OC Spray and the Expandable Baton shall be carried whenever the employee is participating in a planned arrest, search, or prisoner transport.
(Findings of Fact, Nos. 10–11; Appointing Authority's Ex. 1 at 8, R.R. at 243a.)

use of the firearm and safety equipment issued to her, but she never carried any of her safety equipment. (R.R. at 47a–49a.) As to the storage of her firearm, Margerum learned that Manson stored it on the floor of her bedroom, in the corner under a blanket. Manson admitted to Margerum that everyone in the house, including visitors, had access to every room in the house. (R.R. at 49a–50a.) Manson told Margerum that, on August 12, 2008, she discovered that her firearm was missing, along with its holster and two out of three magazines issued for the firearm; Manson indicated that she believed her friend Thompson was responsible. (R.R. at 52a–55a.) Although Manson could not give Margerum Thompson's correct address at the time, she described the location of his home and also identified other people who had access to her home. Margerum said that he asked Manson to obtain the addresses for these people, but Manson later sent an email indicating that she could not do so. (R.R. at 55a–57a.)

Margerum testified that he conducted a second interview with Manson to find out why Manson could not obtain the information on the people she previously identified and, during this interview, Manson reported that the key to her firearm also was missing. (R.R. at 55a–57a.) Margerum stated that, after speaking with Thompson and learning more about the personal relationship between Thompson and Manson, he interviewed Manson a third time. According to Margerum, Manson denied having any sexual relationship with Thompson; Manson said that Thompson had been a friend and that he was last in her home at the end of August 2008, when she told him to leave because she believed

Thompson took her gun. In response to Margerum's questions about Thompson's criminal history, Manson stated that she believed Thompson might have been incarcerated in the past, but she was unaware of any recent trouble. (R.R. at 58a–60a.) On cross-examination, Margerum acknowledged that, when he interviewed Thompson, Thompson denied telling Manson that he was on state parole. (R.R. at 64a.)

Powell testified about Manson's fact-finding conference, during which Manson provided written responses to questions created by the Board's Bureau of Personnel. According to Powell, Manson wrote that she received training on the proper use, handling and storage for her firearm and safety equipment, but she could not remember if she carried the equipment as required. Manson also wrote that she stored her firearm, with the gun lock, in her bedroom, and she stored the key in a knickknack in the dining room. She indicated that Thompson stayed overnight at around the time the gun and key disappeared and that he was the only adult with access to the firearm at the time. Powell opined that, because Manson had been through several mandatory training sessions, she should have known about, and followed, the Board's procedures pertaining to firearms and safety equipment. (R.R. at 75a–81a, 84a.)

Holland, the Board's Director of Training and the author of Board Procedure 5.8, explained the policies and procedures contained in Procedure 5.8 with respect to the storage and use of firearms and safety equipment, and he described the extent of Manson's training in that area.[6] Holland also stated that, several times during

6. Holland discussed printouts of Manson's training record showing that Manson received computer-based training on Procedure 5.8 on May 27, 2008, (Appointing Authority's Ex. 2, R.R. at 276a), and firearms training on May 7, 2004, May 13, 2005, May 12, 2006, and February 2, 2007, (Appointing Authority's Ex. 3, R.R. at 277a–79a), during which Procedure 5.8 is read aloud to each parole agent.

training, parole agents sign a document acknowledging that they read and understand Procedure 5.8, and, following training, agents are tested on their knowledge. (R.R. at 91a–108a.)

Estep provided testimony regarding the Appointing Authority's Code of Conduct and its prohibition against fraternization or private relationships between Board employees and individuals under Board supervision. Estep stated that employees receive training on the Code of Conduct and that Manson signed an acknowledgment indicating that she received and read the Code of Conduct. (R.R. at 120a–23a; Appointing Authority's Ex. 5.) After explaining the disciplinary process, Estep testified that she approved Manson's discharge based on the totality of the allegations sustained in the investigation and the egregious nature of Manson's actions, particularly for an experienced agent. (R.R. at 124a–31a; Appointing Authority's Ex. 6.) In Estep's opinion, the fact that Thompson had been in trouble in the past should have been a "red flag" to an experienced agent, prompting Manson to look Thompson up and know if he was on parole before continuing a relationship with him. (R.R. at 150a.) On cross-examination, Estep acknowledged that parole agents have been disciplined for utilizing the Board's record system, J–Net, to determine if someone they know is on parole, but Estep believed that there were lists of parolees in the office that Manson could have accessed to uncover this information. In fact, Estep testified that she has re-ceived reports from other agents who suspect that someone they know is on parole, and these situations are handled on a case-by-case basis. (R.R. at 151a–55a.)

In response to the Board's evidence,[7] Manson testified that she did not know that Thompson was on parole, and she never had sex with him. (R.R. at 170a, 177a.) Regarding the proper storage of her firearm, Manson stated that she did not know she was storing her gun in an accessible manner. She explained that she had no closets or dressers in which to put the gun, but she thought she was taking appropriate precautions because she had the gun lock in place, she stored the ammunition separately, and she placed the gun out of plain sight "in a comforter and everything." (R.R. at 177a–78a.) Manson also testified that she could not recall going over Procedure 5.8 in training, and she did not know she was violating that policy because no one ever approached her when she was not carrying her equipment to tell her that she was doing something wrong. (R.R. at 178a–79a.)

■ Based on the above testimony, the Commission determined that the Board did not establish just cause for removal under section 807 of the Civil Service Act.[8] (Conclusions of Law, No. 2.) In doing so, the Commission concluded that the Appointing Authority did not prove that Manson violated section B.2 of the Code of Conduct by *knowingly* maintaining a personal relationship with an individual under

---

7. Manson bore the burden of proving her claim that the Board's personnel action was due to discrimination, *Henderson v. Office of the Budget*, 126 Pa.Cmwlth. 607, 560 A.2d 859 (1989), *appeal denied*, 524 Pa. 633, 574 A.2d 73 (1990), and she presented testimony and evidence to support this charge. However, we do not recount this evidence because, as explained in footnote 9 *infra*, the discrimination claim no longer is before us.

8. In an appeal challenging the removal of a regular status employee, the appointing authority has the burden of establishing just cause for the personnel action. *Mihok v. Department of Public Welfare, Woodville State Hospital*, 147 Pa.Cmwlth. 344, 607 A.2d 846 (1992).

the Board's supervision. However, the Commission concluded that the Board presented evidence establishing that Manson violated Procedure 5.8, which constituted good cause for her suspension under section 803 of the Civil Service Act.[9] (Conclusions of Law, No. 3.) Consequently, the Commission modified the Board's discipline of Manson from termination to a thirty-day suspension, without pay or benefits. Following denial of its request for reconsideration,[10] (R.R. at 325a–42a), the Board now petitions this court for review of that order.[11]

The Board argues that the Commission erred when it determined that the Board failed to establish just cause for Manson's removal based on the totality of the circumstances.[12] According to the Board, it not only proved that Manson violated Procedure 5.8, it also presented more than sufficient evidence to prove that Manson acted in direct contravention of the Board's Code of Conduct by maintaining a private relationship with Thompson when Manson knew, or should have known, that Thompson was under the Board's supervision. We disagree.

■ To show just cause for the removal of a regular status civil service employee, the appointing authority must demonstrate that the actions resulting in the removal are related to an employee's job performance and touch in some rational and logical manner upon the employee's competence and ability. *Ellerbee–Pryer v. State Civil Service Commission*, 803 A.2d 249 (Pa.Cmwlth.2002). What constitutes ample just cause for removal is largely a matter of discretion on the part of the head of the department. However, to be sufficient, the cause should be personal to the employee and such as to render the employee unfit for his or her position, thus making dismissal justifiable and for the good of the service. *Woods v. State Civil Service Commission*, 590 Pa. 337, 912 A.2d 803 (2006). Whether actions of a civil service employee constitute just cause for removal is a question of law fully reviewable by this court. *Ellerbee–Pryer*.

■ In support of its position, the Board first contends that Manson clearly violated the Code of Conduct because she *knew* that Thompson was on parole, and her denial of such knowledge is "completely implausible." (Board's brief at 20.) The Board marvels that Manson admits knowing Thompson and his family for over twenty years and yet "expects the Board to believe that no one told her that Mr. Thompson was incarcerated and then on parole." (*Id.*) However, it is irrelevant

---

9. The Commission also considered Manson's claim of sex-based discrimination and concluded that Manson failed to present evidence establishing such discrimination. (Conclusions of Law, No. 1.) In her *pro se* brief to this court, Manson objects to the Commission's ruling, both with respect to the discrimination claim and to the imposition of a suspension for violating Procedure 5.8. However, we need not consider these objections because Manson has not filed a proper cross-appeal in this matter. Indeed, we note that, in concluding her brief, Manson asks only that this court "not reverse" the Commission's existing determination. (Manson's brief at 12.)

10. The Commission also denied the Board's Request for Stay pending the outcome of the Board's appeal to this court. (R.R. at 343a–49a; 395a.)

11. Our scope of review of a decision of the Commission is limited to determining whether the Commission's findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights have been violated. *Morrison v. Department of Corrections*, 659 A.2d 620 (Pa.Cmwlth.1995).

12. We note that the Board does not argue, alternatively, that Manson's violations of Procedure 5.8, by themselves, provide grounds for her dismissal.

whether the Board believes Manson when she denies knowing that Thompson was on parole. The Commission is the sole fact finder in civil service cases and has exclusive authority to assess witness credibility and resolve evidentiary conflicts. *Ellerbee–Pryer.* Here, the Commission not only appeared to credit Manson's denial, it also correctly concluded that the evidence presented by the Board was insufficient to establish Manson's knowledge of Thompson's status as a parolee.[13]

Alternatively, the Board argues that it was not required to prove that Manson *intentionally* violated the Code of Conduct in order to justify her removal; rather, the Board maintains that it could satisfy its burden by showing that Manson's violation of the rule against fraternization was due to negligence. In this regard, the Board points out that Manson was a veteran agent who admitted knowing that Thompson had been in trouble, and possibly incarcerated, in the past. The Board maintains that, given this knowledge, Manson's experience should have prompted her to look up Thompson's records and determine if he was on parole before pursuing a personal relationship with him, and Manson's failure to do so demonstrated a lack of judgment that made her unfit for her position as a Parole Agent II.

The Commission rejected this argument. In doing so, the Commission first noted that Board employees had been disciplined for accessing the Board's records system to see if a person they know had ever been on parole. More important, based on the record, the Commission disagreed that Manson was obliged to conduct this type of "research" before continuing a friendship with someone she had known since they were childhood friends and neighbors. Therefore, the Commission refused to conclude with certainty that Manson knew or should have known that Thompson was a parolee while a guest in her home and, consequently, cleared her of the fraternization charge. Because we cannot say that the Commission erred in reaching this conclusion,[14] we are satisfied that the Commission properly invoked its authority to modify the Board's disciplinary action against Manson from removal to a thirty-day suspension without back pay or benefits. Section 952(c) of the Civil Service Act, 71 P.S. § 741.952(c) (granting the Commission discretion to modify or set aside the disciplinary action of the appointing authority and, where appropriate, order reinstatement with or without payment of salary or wages lost).

Accordingly, we affirm.

### ORDER

AND NOW, this *18th* day of *August,* 2010, the order of the State Civil Service

---

**13.** As the Commission observed: Thompson testified that he never told Manson that he had been in prison; Margerum, who interviewed both Manson and Thompson as part of his investigation, never testified that either told him that Manson had knowledge that Thompson was a former inmate on parole; and Estep, the only Appointing Authority witness who attempted to impute such knowledge to Manson, testified that she believed Thompson's written statement (not in the record) indicated that he thought Manson knew he was incarcerated, something Thompson denied at the Commission hearing. (Commission op. at 32.)

**14.** It is apparent from the record that Manson and Thompson had not had contact with each other for years before meeting again in 2006. We note that, although Manson told Margerum that she believed Thompson might have been in trouble and, possibly, incarcerated in the past, she also stated that she was unaware of any recent trouble. (R.R. at 58a–60a.) Moreover, the record does not indicate that anything occurred to rouse Manson's suspicions about Thompson between 2006 and 2008, when Manson asked Thompson to leave her home.

Commission, dated September 15, 2009, is hereby affirmed.