IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David B. Shambaugh,             :
             Petitioner      :
                           :
        v.                  :
                           :
Department of Human Services,   :
Bureau of Juvenile Justice Services  :
(State Civil Service Commission),   :   No. 1768 C.D. 2024
             Respondent   :   Submitted: March 3, 2026

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                          FILED:  April 23, 2026

David B. Shambaugh (Shambaugh), pro se, petitions this Court for review of the State Civil Service Commission's (SCSC) October 23, 2024 Adjudication dismissing Shambaugh's appeal and sustaining the Department of Human Services (DHS), Bureau of Juvenile Justice Services' (Appointing Authority) removal of Shambaugh from his regular employment as a Juvenile Justice Specialist Supervisor (JJSS).  Shambaugh presents two issues for this Court's review: (1) whether the SCSC erred by concluding that the Appointing Authority had just cause for Shambaugh's removal; and (2) whether the Appointing Authority afforded Shambaugh due process.  After review, this Court affirms.

The Appointing Authority employed Shambaugh as a JJSS at its Loysville Youth Development Center (LYDC), a secure facility where juveniles up to 21 years of age who have been adjudicated in the juvenile justice system are

housed.[1]  Shambaugh was aware of the Appointing Authority's Radio Usage - Responding to Emergency Situations Policy 1.31 (BJJS Policy 1.31). *See* Reproduced Record (R.R.) at 58-64;[2] *see also* Certified Record (C.R.) Item 1, June 11, 2024 Notes of Testimony (N.T.) at 226-227.  Section IV.A.2 of BJJS Policy 1.31 mandates that "[a]ll available direct supervision and designated employees will respond to [Emergency Safety Physical Intervention (]ESPI[)[3]] assistance calls." R.R. at 63.

On August 7, 2023, Shambaugh purportedly failed to respond to an incident involving ESPI assistance in the LYDC's secure treatment unit.  On August 8, 2023, Youth Development Counselor Manager Kenneth Cecil (Cecil) verbally notified Shambaugh that Shambaugh was being suspended from his JJSS position without pay pending further investigation of the August 7, 2023 incident.  *See* R.R. at 66; *see also* Shambaugh Br. at 7.  By August 15, 2023 letter, the Appointing Authority confirmed Cecil's verbal notification of Shambaugh's suspension.  *See* R.R. at 66-68; *see also* Shambaugh Br. at 7.

On September 8, 2023, Cecil showed Shambaugh two video recordings of the incident - one from the LYDC's South Dorm hallway where the incident occurred, and the other from the "T" section of the main hallway facing the LYDC's North Dorm.  *See* R.R. at 82; *see also* Exs. AA-1, AA-2 (video footage).  That same

---

[1] LYDC's residents, approximately 85% of whom are from Philadelphia County, have spent a year in prison as a result of crimes ranging from aggravated assault to murder and then are decertified and sent to LYDC for a predetermined time or until they turn 21.  *See* Certified Record Item 1, June 11, 2024 Notes of Testimony at 170-171.  The average age of LYDC's residents is 17.6 years.  *See id*. at 171.

[2] The Reproduced Record pages are not numbered with a small "a" as required by Pennsylvania Rule of Appellate Procedure 2173.  *See* Pa.R.A.P. 2173 ("[T]he pages of . . . the reproduced record . . . shall be numbered separately in Arabic figures . . . : thus 1, 2, 3, etc., followed . . . by a small a, thus la, 2a, 3a, etc. . . ."). Therefore, this Court references electronic pagination herein.

[3] BJJS Policy 1.31 specifies that "[ESPI] refers to the application of force that restricts mobility or movement or that disengages from harmful physical contact."  R.R. at 59.

day, Shambaugh provided a statement wherein he claimed that he removed himself from the incident because Resident D (D) was angry with him and he called other staff to assist. *See id.* Also on September 8, 2023, the Appointing Authority mailed Shambaugh a letter informing him that he was under investigation for:[4]

> <u>Failure to Follow General Instructions and Procedures</u> (as defined in [S]ection 7174 of [DHS] Human Resource [(HR)] Policy Manual [(HR 7174)])[;] specifically, on August 7, 2023[,] you abandoned a co-worker while he was being assaulted[,] causing him serious harm. Your failure to assist [wa]s a violation of [Appointing Authority] [BJJS Policy 1.31] and falls below the standards of someone in your position.

R.R. at 69. By September 8, 2023 letter, the Appointing Authority also notified Shambaugh of a pre-disciplinary conference to be held on September 14, 2023, at which the Appointing Authority would afford him the opportunity to answer the allegation against him. *See id.*; *see also* Shambaugh Br. at 8.

On September 14, 2023, Shambaugh appeared at the pre-disciplinary conference, which Acting Juvenile Justice Complex Director, Jason Reisinger (Reisinger) and two union representatives also attended. *See* R.R. at 72-74. The parties examined the August 7, 2023 video recordings. Shambaugh submitted a statement in which he admitted that he was aware that Juvenile Justice Staff (JJS) Jeffrey Yetter (Yetter) and JJSS Dakota Ward (Ward) had initiated an ESPI, but claimed he left the scene because Yetter had directed him to do so, and after which he monitored the other residents to ensure they did not become involved. *See* R.R. at 83. The Appointing Authority also obtained written statements from Yetter and

---

[4] The Appointing Authority listed two additional causes. However, after having determined that the August 7, 2023 incident was alone sufficient just cause for Shambaugh's removal, it did not present evidence at the hearing to support the other causes, and the SCSC did not consider them. *See* Ex. AA Adj. at 3 n.1. Accordingly, those causes are not before this Court.

3

Ward, in which they declared that Shambaugh left the scene without rendering assistance, which placed them in danger and resulted in injuries. *See* R.R. at 84-86.

By November 13, 2023 letter, the Appointing Authority notified Shambaugh of his removal effective at the close of business on November 20, 2023, due, *inter alia*,[5] to:

> Failure to Follow General Instructions and Procedures (as defined in [S]ection 7174 of [DHS HR 7174, *see* Ex. AA-6 (R.R. at 45-57);] specifically, on August 7, 2023[,] you abandoned a co-worker while he was being assaulted[,] causing him serious harm. Your failure to assist [wa]s a violation of [Appointing Authority] [BJJS Policy 1.31] and falls below the standards of someone in your position.

R.R. at 76.

Shambaugh appealed from his removal to the SCSC. In his appeal, Shambaugh argued that the Appointing Authority denied him due process because he was not told until the end of the pre-disciplinary meeting that he was the target of an investigation or that he was being suspended, and he was never informed that he could request union representation for that meeting. *See* R.R. at 93. The SCSC held a hearing on June 11, 2024. *See* C.R. Item 1. On October 23, 2024, the SCSC dismissed Shambaugh's appeal and sustained his removal. *See* C.R. Item 2, Adjudication. Shambaugh appealed to this Court.[6]

---

[5] The Appointing Authority again listed the two additional causes that it ultimately did not pursue. *See supra* note 4.

[6] "This Court's review of a[n SCSC] adjudication is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law has been committed[,] or whether constitutional rights have been violated." *Pa. Game Comm'n v. State Civ. Serv. Comm'n (Wheeland)*, 219 A.3d 1257, 1264 n.3 (Pa. Cmwlth. 2019).

> Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, . . . 462 A.2d 637, 639-40 ([Pa.] 1983). It is irrelevant whether the record contains evidence to support findings other than those made by the tribunal; the critical

4

Shambaugh first argues that the SCSC erred by concluding that the Appointing Authority had just cause for his removal. Specifically, Shambaugh asserts that the record evidence did not support that he violated BJJS Policy 1.31. Rather, he claims that the record evidence establishes that when the August 7, 2023 incident occurred, he was not considered "available" staff, *see* Section IV.A.2 of BJJS Policy 1.31 (R.R. at 63), he made the assistance call, he maintained supervision of the rest of the residents and attempted to locate additional staff, and he assessed the area. Shambaugh adds that his removal was improper because it involved a performance-based issue rather than a disciplinary action.

Initially, Section 2607 of what is commonly known as the Civil Service Reform Act (Act) provides: "No regular employee in the classified service may be removed, except for just cause." 71 Pa.C.S. § 2607. Therefore, "[i]n an appeal challenging the removal of a regular status employee, the appointing authority has the burden of establishing just cause for the personnel action." *Pa. Bd. of Prob. & Parole v. State Civ. Serv. Comm'n*, 4 A.3d 1106, 1112 n.8 (Pa. Cmwlth. 2010). Although the Act does not define *just cause*, this Court has explained that "just cause for removal is largely a matter of discretion on the part of the head of the department." *Perry v. State Civ. Serv. Comm'n (Dep't of Lab. & Indus.)*, 38 A.3d 942, 951 (Pa. Cmwlth. 2011). This Court has expounded:

inquiry is whether there is evidence to support the findings actually rendered. *Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Rev.*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008). In ascertaining whether substantial evidence exists, the reviewing court must give the party in whose favor the decision was rendered the benefit of all inferences that can be logically and reasonably drawn from the evidence. *Id.*

*Local Dispensaries, LLC v. Dep't of Health*, 330 A.3d 550, 555 n.8 (Pa. Cmwlth. 2025).

> To show just cause for the removal of a regular status civil service employee, the appointing authority must demonstrate that the actions resulting in the removal are related to an employee's job performance and touch in some rational and logical manner upon the employee's competence and ability. *Ellerbee-Pryer v. State Civ*[.] *Serv*[.] *Comm*[*'n*], 803 A.2d 249 (Pa. Cmwlth. 2002). What constitutes ample just cause for removal is largely a matter of discretion on the part of the head of the department. However, to be sufficient, **the cause should be personal to the employee and such as to render the employee unfit for his or her position**, thus making dismissal justifiable and for the good of the service. *Woods v. State Civ*[.] *Serv*[.] *Comm*[*'n*], . . . 912 A.2d 803 ([Pa.] 2006). Whether actions of a civil service employee constitute just cause for removal is a question of law fully reviewable by this [C]ourt. *Ellerbee-Pryer*.

*Pa. Bd. of Prob. & Parole*, 4 A.3d at 1112 (emphasis added).

HR 7174 provides that "disciplinary actions against [DHS] employees must be taken only after application of controlling provisions of the concepts of just cause, due process, and union representation rights." Ex. AA-6 at 3 (R.R. at 47). HR 7174's Table of Disciplinary/Corrective Action (Table) authorizes the Appointing Authority to discipline an employee for "Failure to Follow General Instructions and Procedures."[7] Ex. AA-6 at 24 (R.R. at 56). BJJS Policy 1.31 is a General Instruction or Procedure, the violation of which subjects the Appointing Authority's employees to discipline. *See* N.T. at 45. HR 7174 authorizes the Appointing Authority to discharge an employee based on a first offense if that offense is "serious in nature." Ex. AA-6 at 24 (R.R. at 56).

At the hearing, the then-Bureau HR Director Jonathan Swanger (Swanger)[8] testified that Shambaugh was made aware of BJJS Policy 1.31 during

---

[7] The HR 7174 Table includes the following warning: "CAUTION: Not applicable to cases where an employee is instructed to perform a task, which they do, but they perform it wrong. That is a performance issue that should be handled accordingly (nor would it be a case of minor insubordination[])[.]" Ex. AA-6 (R.R. at 56); *see also* N.T. at 59.

[8] Swanger is now the HR Director of the Pennsylvania Fish and Boat Commission.

6

training and via emails to all staff members. *See* N.T. at 46, 190-191. Swanger described that after being made aware of the August 7, 2023 incident, discussing it with the Appointing Authority's management, and reviewing video recordings thereof, the Appointing Authority decided to move forward with an investigation, and suspended Shambaugh pending that investigation. *See* N.T. at 16-17, 19-20, 22, 27.

Swanger stated that the August 7, 2023 incident constituted an ESPI for which an assistance call was made, that Shambaugh was a direct supervision employee and, based on his presence in the South Dorm, he would have been available to assist Yetter and Ward. *See* N.T. at 42-43. Swanger explained, however, based on his review of the video recordings, it was clear that while Yetter and Ward were attempting to de-escalate D in the LYDC's secure treatment unit, Shambaugh left the area and watched the incident unfold through a window as other staff responded to the assistance call. *See* N.T. at 20-40; *see also* Exs. AA-1, AA-2. Although Swanger acknowledged that Yetter had told Shambaugh to leave the South Dorm, he confirmed that, as a JJSS, Shambaugh outranked Yetter. *See* N.T. at 54-55, 57, 66, 69-72.

Swanger concluded, based on his investigation, that Shambaugh failed to comply with BJJS Policy 1.31 on August 7, 2023. *See* N.T. at 46. Swanger indicated, and recommended up the chain of command and to DHS's labor relations division and legal, that, taking into account Shambaugh's understanding of BJJS Policy 1.31, the video footage, the witnesses' explanations, the length and nature of Shambaugh's service, Shambaugh's previous employment history, and the degree of Ward's injuries, the proper level of discipline for Shambaugh was discharge. *See* N.T. at 46-48, 83, 184-188; *see also* Ex. AA-6 at 24 (R.R. at 56).

Yetter testified that he and Youth Development Counselor Mader (Mader)[9] had successfully de-escalated D after a prior incident, but for some reason, Shambaugh continued to speak to D, which caused D to re-escalate. *See* N.T. at 78-81, 83-84, 87, 89-91. Yetter described that Shambaugh initially walked away, but then returned and stood in D's doorway. *See* N.T. at 91. Yetter recalled that, before the incident occurred, he asked Shambaugh to leave the South Dorm because Yetter had D calmed down and Yetter did not need Shambaugh's assistance at that time. *See* N.T. at 81. Yetter described that D also suggested that Shambaugh leave and warned that if he did not, D would put his shoes back on[10] and count to 10. *See* N.T. at 81-82. Yetter explained that Ward entered the South Dorm to assist with D, Shambaugh stepped in front of D, D began to put his shoes on and count, D lunged at Shambaugh but grabbed Ward, and D began punching Ward as Shambaugh exited the South Dorm. *See* N.T. at 81-82, 86-89, 92-99, 101.

Yetter acknowledged that removing the fuel or point of aggression from a situation is among the de-escalation techniques LYDC uses, but maintained that Shambaugh should not have left once the physical altercation began, leaving co-workers to handle the situation as he watched from outside the unit. *See* N.T. at 93-94, 97-103. The video recording shows Shambaugh on the outside of the South Dorm walking away from the window then returning to look again as the altercation continued. *See* N.T. at 103-104. Although Yetter admitted that Ward may have blocked Shambaugh's line of sight at some points, Yetter maintained that what was happening would have been obvious to Shambaugh. *See* N.T. at 110, 114-115. Yetter recollected that other staff eventually entered the South Dorm and helped gain

---

[9] Mader's full name is not included in the record.

[10] Yetter and Mader had D remove his shoes while de-escalating him from the prior incident. *See* N.T. at 78. Removing residents' shoes reduces the residents' gripping power. *See id*. LYDC staff have learned that a resident puts his shoes on when he is about to become assaultive. *See* N.T. at 123.

control of the situation. *See* N.T. at 82. Yetter stated that Shambaugh never explained why he left instead of helping when D got physical. *See* N.T. at 85.

Ward testified that he is the same rank as Shambaugh. *See* N.T. at 124. He further declared that it is crucial for LYDC staff to have 100% confidence that other staff will assist during times of a resident's physical aggression to ensure safety of both staff and residents. *See* N.T. at 130. Ward described that, before he returned to his assigned unit after assisting with the prior call involving D, he checked the North and South Dorms to make sure everything was okay. *See* N.T. at 120-123. As he checked the South Dorm, Ward observed D putting his shoes on and making threats of violence toward Shambaugh. *See* N.T. at 123-124. Ward recalled first using verbal and touch prompts (i.e., least restrictive alternatives) in an effort to de-escalate D, but when D came out of his room, Ward initiated a safe crisis management (SCM) technique - putting his arms around D's torso - to prevent him from assaulting Shambaugh. *See* N.T. at 123-125, 135. He claimed that he did not instruct Shambaugh to leave the area once it became clear that D was becoming combative. *See* N.T. at 124. Ultimately, D broke free from Ward's hold and began assaulting Ward as Shambaugh exited the South Dorm and watched from the hallway. *See* N.T. at 125-129, 136-137, 140-141, 143-147.

Ward admitted that he did not call on Shambaugh to help during the incident, *see* N.T. at 134, but explained:

> A. The moment [D] came out of the room and the SCM is initiated, us as staff members are taught to assist your fellow staff member with that [SCM].
>
> Q. And now we see at that point.
>
> A. At this point, whenever a resident becomes assaultive or is getting[] under the use of [SCM], whether a resident is escalated at a certain staff member or not, it is the staff member's responsibility to assist in ESPI.

9

N.T. at 125-126; *see also* N.T. at 136. Ward expounded:

> There was no efforts [sic] [by Shambaugh] to assist in that incident. The moment that [SCM] is initiated, all staff members present are to assist. I expected [] Shambaugh to assist in SCM here. However, when the assault happened, he had left the door [sic]. At one point, I saw him look through the window as I was getting assaulted. I remember that part very vividly.

N.T. at 132.

According to Ward, there was nothing more pressing for Shambaugh to be doing other than assisting Ward at that time. *See* N.T. at 128-130, 132-133. Ward added that even if Shambaugh was calling for assistance, there was ample time for him to do so and also assist Ward. *See* N.T. at 133. At the very least, after the first punch, while D's back was to Shambaugh, Shambaugh could have approached from behind and placed D in an upper torso assist to prevent the following seven or more punches D inflicted on Ward. *See* N.T. at 146-148.

JJSS Tony Pollock (Pollock) testified that he became aware of the August 7, 2023 incident when he heard the assistance call, which had been made by someone pressing what he termed the *man down* button on their radios. *See* N.T. at 152-153, 155-156. Pollock recalled that, as he and security guard Pittman (Pittman)[11] entered the South Dorm, he observed that D had Ward in a headlock, and Yetter was holding D's other arm to prevent D from being able to continue punching Ward. *See* N.T. at 153. Pollock explained that he and the other staff members were able to remove Ward from D's headlock, and then he, Yetter, and JJS Hanson (Hanson)[12] were able to de-escalate D and return him to his room. *See id.* Pollock added that although Shambaugh was the closest JJSS to the incident, he did not enter the South Dorm with Pollock and Pittman to assist. *See* N.T. at 157, 160. Based on

---

[11] Pittman's full name is not included in the record.
[12] Hanson's full name is not included in the record.

Pollock's observation of Shambaugh's actions on the video recording while he was in the hallway outside the South Dorm, Shambaugh did not make the assistance call. *See* N.T. at 156-157. However, he did not know who pressed the *man down* button. *See* N.T. at 160.

Reisinger testified that he was the officer in charge on August 7, 2023, and Ward reported the incident to him after it occurred. *See* N.T. at 164. Reisinger directed Ward and the others to document what happened by email, reviewed the video recordings, determined that an investigation was warranted, and reported the matter to Swanger and Appointing Authority Regional Director, Brian Jones. *See* N.T. at 165-166. Reisinger described that, once he gathered all of the information, he conducted the pre-disciplinary conference, where he met with Shambaugh and union representatives. *See* N.T. at 167. Reisinger stated that Shambaugh's explanation for not intervening in the incident was that he was told to leave and he did not see an assault, as he was focusing his attention on the residents down the hall to be sure they did not involve themselves. *See* N.T. at 167-169. Reisinger passed his investigation materials on to Swanger who, along with DHS's labor relations office and legal department, determined that Shambaugh should be removed. *See* N.T. at 173-175, 185-186. Reisinger declined Shambaugh's invitation to consider this incident a coachable moment for Shambaugh, in light of his supervisory position, his prior documented coachable moments, and the egregiousness of the incident. *See* N.T. at 177-178.

Reisinger declared:

Q. . . . How -- how crucial is it that coworkers support each other in this type of crisis?

A. It's very crucial. We only have each other to address and handle situations as we witnessed today on the video. If staff don't respond, then bodily harm to include not

being able to work ever again can occur through someone being assaulted or injured during a crisis situation.

N.T. at 170. Reisinger maintained that once the situation "went hands on," Shambaugh should not have left the South Dorm because everyone present needed to respond to ensure nobody got hurt or further assaulted. N.T. at 176. Reisinger added that a failure to act, like Shambaugh's, creates poor morale, lack of trust, and makes it difficult to retain employees. *See* N.T. at 174-175.

Shambaugh testified that although he exited the South Dorm and turned back to look through the window, he did not witness D strike Ward because Yetter blocked his view of the incident. *See* N.T. at 198-199, 204-210, 214. Notwithstanding, he admitted Yetter told him to leave several times *before* the assault began, but he stayed and stood in D's doorway, and left only after Ward placed D under SCM when things escalated. *See* N.T. at 215-216, 218-226. Shambaugh also acknowledged that the reason he went to get Hanson was because he was aware that assistance was needed. *See* N.T. at 202-203. Shambaugh further acquiesced:

Q. But that door is not soundproof, isn't [sic] it?

A. No[.]

Q. So you can hear what's going on as well. Correct?

A. I could hear somebody else if they need assistance as well, yes.

COMMISSIONER: The question is, could you hear the altercation on the other side of the doors?

A. A 100 [sic] percent, yes. Yes.

Q. You can hear the altercation?

A. Yes.

N.T. at 211.

12

Shambaugh claimed that once he was aware of the physical altercation, he made the assistance call, but he did not use the man down radio alert. *See* N.T. at 198, 205-206. Shambaugh added that he went to the North Dorm and brought Hanson to the South Dorm to help. *See* N.T. at 198-200, 213-214. Shambaugh explained that he did not assist because he was the source of D's escalation, Yetter told Shambaugh to leave, and he did not return after being aware of the fight because he was concerned about D reporting him to ChildLine[13] for injuries. *See* N.T. at 199-207, 212-213, 226. Shambaugh admitted that, after he determined that his leaving would not de-escalate D and there was an ESPI, BJJS Policy 1.31 required that he, as the closest available direct supervisor, had a duty to assist. *See* N.T. at 226-227. Shambaugh acknowledged that Yetter, Hanson, Pollock, and Pittman assisted in the incident despite concerns for potential ChildLine reports. *See* N.T. at 212-213.

> It is well settled that the [SCSC] has the inherent power to determine the credibility of witnesses and the value of their testimony. . . . In making its findings, the [SCSC] must base the findings upon substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion.

*McAndrew v. State Civil Serv. Comm'n (Dep't of Cmty. & Econ. Dev.)*, 736 A.2d 26, 31 (Pa. Cmwlth. 1999) (citations omitted); *see also Allegheny Cnty. Dep't of*

---

[13] Section 3490.4 of the Department of Human Services' Regulations defines *ChildLine*, in relevant part, as

> [a]n organizational unit of the Department [of Human Services] which operates a [s]tatewide toll-free system for receiving reports of suspected child abuse established under [S]ection 6332 of the [Child Protective Services Law, 23 Pa.C.S. § 6332] . . . , refers the reports for investigation[,] and maintains the reports in the appropriate file.

55 Pa. Code § 3490.4.

*Health v. Wilkerson*, 329 A.3d 111 (Pa. Cmwlth. 2024). This Court will not reweigh the evidence or substitute its judgment. *See Perry*.

Based on the evidence the Appointing Authority presented, the SCSC concluded that the Appointing Authority met its burden of proving just cause for Shambaugh's removal, reasoning:

> Having reviewed all the testimony and evidence to include the video recordings, [the SCSC] find[s] [Shambaugh] violated BJJS Policy [1.31] by failing to assist Ward and Yetter during an ESPI. Initially, [the SCSC] do[es] not find credible [Shambaugh's] testimony he did not see Ward get hit. The assault occurred right in [Shambaugh's] line of sight within just a few feet of his location. After exiting South Dorm, [Shambaugh] continued to watch the assault through the window of the South Dorm exit door. Finally, [Shambaugh] provided contradictory testimony as to whether he did or did not see the physical altercation. Considering [Shambaugh's] conflicting testimony and the video recordings which clearly shows the assault was in [Shambaugh's] direct line of sight [the SCSC] find[s] his testimony to the contrary not credible.
>
> [The SCSC] will now address how [Shambaugh's] failure to assist, upon viewing the assault, violated BJJS Policy [1.31]. First, the assault was an ESPI because both Ward and Yetter had to apply force to disengage from harmful physical contact. Second, as a supervisory employee witnessing an ESPI, [Shambaugh] was required to assist under BJJS Policy [1.31]. Third, [Shambaugh] did not assist Ward and Yetter in violation of BJJS Policy [1.31]. Finally, [Shambaugh] acknowledged he was trained that under BJJS Policy [1.31] he had an absolute duty to assist once a situation became physical, and this duty remained even if his presence had caused the situation to become physical. Accordingly, [Shambaugh's] failure to assist during an ESPI violated BJJS Policy [1.31].
>
> Having found [Shambaugh] violated BJJS Policy, [the SCSC] further find[s] [Shambaugh's] conduct substantiated by the [A]ppointing [A]uthority provided just cause for [Shambaugh's] removal. [HR 7174] allows discharge for a first offense after probation if the violation

14

is serious in nature. AA[-]Ex. 6. [Shambaugh's] violation is he failed to assist two fellow co-workers being assaulted. Instead of assisting, [Shambaugh] fled the area and watched his co-workers being assaulted through the window of the South Dorm exit door. The assault began at 7:10:10 p.m. and ended [1] minute and [32] seconds later at 7:11:42 p.m. During that time, Ward was hit numerous times. [Shambaugh's] failure to follow BJJS Policy [1.31] not only caused injury to Ward, but also compromised the safety of LYDC staff and its juvenile residents. [The SCSC] find[s] such a violation to be of a serious nature.

[The SCSC] also find[s] [Shambaugh's] failure to follow BJJS Policy [1.31] touched upon his competency and ability to perform his job. As a managerial employee, [Shambaugh] can be held to the highest level of conduct. *Woodbridge v.* [] *Dep*[']*t of Revenue*, 435 A.2d 300, 302 (Pa. C[mwlth]. 1981). As a supervisory employee, [Shambaugh] should be setting an example for subordinate employees by strictly adhering to safety policies. *Id*. Furthermore, [Shambaugh's] failure to strictly adhere to BJJS Policy [1.31] resulted in physical injury to Ward, and compromised the safety of his subordinates, coworkers, and juvenile residents. [Shambaugh's] failure to adhere to the [A]ppointing [A]uthority's and Commonwealth's policies put in place to ensure the safety of his subordinates, coworkers, and juvenile residents calls into question his competency and ability as a [JJSS]. *See Mihok* [*v. Dep't of Pub. Welfare, Woodville State Hosp.*, 607 A.2d 848 (Pa. Cmwlth. 1992)].

Adjudication at 15-16.

Based on this Court's review, substantial record evidence clearly supported the SCSC's conclusion that Shambaugh violated BJJS Policy 1.31 and, thus, the SCSC did not err by concluding that the Appointing Authority had just cause for his removal.

Shambaugh also argues that the SCSC failed to address the Appointing Authority's due process violations. Shambaugh specifically claims that he was not provided sufficient notice when he was suspended pending investigation of the

15

August 7, 2023 incident.[14] He further asserts that the Appointing Authority's investigation exceeded the 60-day limit in Section 803 of the Civil Service Act of 1941.[15]

While it is true that the SCSC did not address Shambaugh's claim that the Appointing Authority violated his due process rights, the record clearly reflects that Shambaugh received all of the process that he was due.

The United States Supreme Court has declared:

> The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. **The tenured public employee is entitled to oral or written notice of the charges against him**, **an explanation of the employer's evidence**, **and an opportunity to present his side of the story**. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) (emphasis added; citations omitted).

Shambaugh admits that Cecil verbally notified him on August 8, 2023, that he was being suspended from his JJSS position without pay pending further investigation of the August 7, 2023 incident. *See* R.R. at 66; *see also* Shambaugh Br. at 7. Shambaugh also acknowledges that the Appointing Authority confirmed Cecil's verbal notification to Shambaugh in an August 15, 2023 letter. *See* R.R. at

---

[14] Shambaugh also contends that the Appointing Authority investigated a similar offense against him about which it did not inform him. *See* Shambaugh Br. at 19. However, because the Appointing Authority opted not to base its removal on other incidents, *see supra* notes 4-5, this Court will not address that portion of Shambaugh's argument.

[15] Section 803 of the former Civil Service Act of 1941, Act of August 5, 1941, P.L. 751, *as amended*, *former* 71 P.S. § 741.803, was repealed by Section 2 of the Act of June 28, 2018, P.L. 460, effective March 28, 2019. Therefore, it did not apply to Shambaugh's 2023 suspension.

66-68; *see also* Shambaugh Br. at 7. On September 8, 2023, Cecil obtained Shambaugh's statement and showed him the two video recordings of the incident. *See* R.R. at 82; *see also* Exs. AA-1, AA-2. By September 8, 2023 letter, the Appointing Authority informed Shambaugh of its investigation into his August 7, 2023 BJJS Policy 1.31 violation. *See* R.R. at 69; *see also* Shambaugh Br. at 8. Also, by the September 8, 2023 letter, the Appointing Authority notified Shambaugh of the September 14, 2023 pre-disciplinary conference, *see id.*, which Shambaugh attended in the presence of two union representatives. *See* R.R. at 72-74; *see also* Shambaugh Br. at 8. At the pre-disciplinary conference, the Appointing Authority showed Shambaugh Yetter's and Ward's statements and the video recordings. Thereafter, Shambaugh received the Appointing Authority's November 13, 2023 removal letter, from which he appealed. *See* R.R. at 76-81; *see also* Shambaugh Br. at 8. Clearly, Shambaugh received the requisite due process.

To the extent Shambaugh is claiming that the Appointing Authority violated his due process rights because his suspension exceeded the 60 days (effective August 8, 2023) specified in the Appointing Authority's August 15, 2023 suspension letter, based on the record before this Court, the first time Shambaugh appealed from his suspension was along with his appeal from his removal filed on December 5, 2023. *See* R.R. at 90, 93. Section 105.12a(b) of the SCSC's Regulations, 4 Pa. Code § 105.12a(b), grants an employee 20 days to appeal from a suspension which, in this case, was effective August 8, 2023. Thus, he had until August 28, 2023, to file an appeal. In the Adjudication, the SCSC declared:

> During [Shambaugh's] case-in-chief, [he] provided testimony related to his suspension pending investigation. N.T. [at] 196-197. [Shambaugh's] request for a hearing on the suspension pending investigation . . . was denied as

17

untimely.[16] [Shambaugh] did not request reconsideration of our denial. Accordingly, the suspension pending investigation was not a subject of this hearing.

Adjudication at 16 n.13. Because Shambaugh did not timely appeal from his suspension, neither the SCSC nor, by extension, this Court have jurisdiction to consider it. *See Petsinger v. Dep't of Lab. & Indus., Off. of Vocational Rehab.*, 988 A.2d 748 (Pa. Cmwlth. 2010) (the SCSC lacks jurisdiction to consider a late appeal). Accordingly, Shambaugh offered no support for his claim that the Appointing Authority violated his due process rights.

      Based on the foregoing, the SCSC's Adjudication is affirmed.

_____
ANNE E. COVEY, Judge

---

[16] If Shambaugh filed a separate appeal from his suspension, documentation thereof and the SCSC's denial are not included in the record provided to this Court.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David B. Shambaugh,                          :
        Petitioner                    :
                              :
        v.                               :
                              :
Department of Human Services,                :
Bureau of Juvenile Justice Services          :
(State Civil Service Commission),            :   No. 1768 C.D. 2024
        Respondent                    :

## O R D E R

AND NOW, this 23rd day of April, 2026, the State Civil Service Commission's October 23, 2024 Adjudication is affirmed.

 

_____
ANNE E. COVEY, Judge